## HARRISON et al. v. FITE et al.

(Circuit Court of Appeals, Eighth Circuit. October 22, 1906.)

No. 2,250.

1. BOUNDARIES—WATERS AND WATER COURSES -TITLE TO SOIL UNDER WATERS—LAW GOVERNING.

The question whether the title to the soil under the waters of a lake or stream, whether navigable or not, passes to the grantee of the shore land, is determined by the law of the state in which the land lies.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 8, Boundaries, § 96; vol. 37, Navigable Waters, § 181.]

2. SAME—RIPARIAN OWNERS—LAW OF ARKANSAS.

In Arkansas a riparian owner takes all accretions, whether the water course be navigable or not. His title extends to the thread of an unnavigable stream, and in the case of a navigable stream to high-water mark or the limit of the bed; the title to the bed being in the state for the use of the public.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, Navigable Waters, §§ 270–272; vol. 48, Waters and Water Courses, §§ 99–101; vol. 8, Boundaries, §§ 108–117.]

3. NAVIGABLE WATERS—BED OF NAVIGABLE STREAM.

The bed of a navigable stream is that soil so usually covered by water that it is wrested from vegetation, and does not extend to or include that upon which grasses, shrubs, and trees grow, though covered by the great annual rises.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, Navigable Waters, §§ 180–227.]

4. SAME—NAVIGABILITY.

To meet the test of navigability as understood in the American law, a water course must have a useful capacity as a public highway of transportation. A theoretical or potential navigability, or one that is temporary, precarious, and unprofitable, is not sufficient to impress upon it a public servitude.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, Navigable Waters, §§ 5–15.]

5. SAME.

It does not follow that, because a stream or body of water was once navigable, it has continued and remains so; and whenever, from any natural or other cause its practical utility as a means of transportation has been permanently destroyed, it should cease to be classed among those waters that are charged with a public use.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, Navigable Waters, §§ 5–15.]

6. SAME—EVIDENCE OF NAVIGABILITY—GOVERNMENT SURVEY.

The action of the government surveyor in meandering a body of water or in surveying its bed is to be considered as evidence upon the question of its navigability or unnavigability; but it is not conclusive.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, Navigable Waters, §§ 12–15.]

7. BOUNDARIES—TITLE OF RIPARIAN GRANTEES.

If the United States has disposed of lands bordering upon a meandered unnavigable water course or lake by a patent containing no reservations, and there is nothing else indicating an intention to withhold title to the lands within the meander lines, it has nothing left to convey, and whether

the title to the bed of the waters is in the state or passes to the grantee in the patent is determined by the local law.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 8, Boundaries, §§ 95–108, 111–114; vol. 37, Navigable·Waters, §§ 181, 184, 186, 201–215.]

8. APPEAL—REVIEW—FINDINGS OF FACT.
The finding of a chancellor upon conflicting evidence will be deemed presumptively correct by an appellate court, and will not be disturbed unless an obvious error has occurred in the application of the law or a serious mistake has been made in the consideration of the evidence.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 3, Appeal and Error, § 3974.]

9. EVIDENCE—JUDICIAL NOTICE—NAVIGABILITY OF WATERS.
The courts take judicial notice of the navigable character of important rivers and inland lakes, but as to those of insignificant capacity and doubtful utility the question is one of fact, to be determined on evidence, and the burden of proof rests upon the party who asserts the existence of the public servitude.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 20, Evidence, § 13; vol. 37, Navigable Waters, § 12.]

10. NAVIGABLE WATERS—NAVIGABILITY—FINDING CONSIDERED.
A finding affirmed that Big Lake, in northeastern Arkansas, is not a part of Little river, but that the river flows along its western boundary in a defined channel, and that the lake is not a navigable body of water; also that the river, whatever it may once have been, is not now navigable in a legal sense, and that the lands of riparian owners on the eastern side of the lake extend across it to the thread of the stream.

Appeal from the Circuit Court of the United States for the Eastern District of Arkansas.

This was a suit by Fite and Acklen, officers and trustees of a voluntary association known as the "Big Lake Shooting Club," for an injunction restraining the defendants, Harrison and 36 others, most of whom were averred to be market hunters and fishermen, from trespassing upon the property of the club and killing wild fowl thereon, for shipment and sale. The property in controversy is a part of the bed of what is known as "Big Lake" and "Little River," located in the northeastern corner of the state of Arkansas and extending as far north as the Missouri line. It is not disputed that the complainants, as trustees for their club, hold title to strips of land 10 feet in width adjacent to and abutting upon the meander line of Big Lake as shown by the government survey made about the year 1834. But it is denied by the defendants that the rights of the riparian owners extend further than the meander line. It is claimed by them that Big Lake is a part of Little river and contains various navigable channels over which steamboats can be operated at all seasons of the year; that Little river is itself a navigable stream; and that they have full right to go upon all parts of it, including Big Lake, in their hunting and fishing pursuits. On the other hand, the complainants claim that Little river is unnavigable, and is a distinct stream running along the western margin of the surveyed area of the lake, and that the remainder of the land in controversy is a lake only in name, being nothing more, even in times of high water, than an unnavigable morass or swamp, wholly useless for purposes of navigation, and that it long since became by accretion a part, in fact and title, of the surveyed lands along the eastern meander line; also that as the owners of lands on both sides of Little river their title extends to the thread of that unnavigable stream. Upon final hearing the Circuit Court sustained the theory of the complainants and entered a decree perpetually enjoining the·defendants from trespassing upon the property in dispute. The defendants appealed.

As it appears from the maps, the surveyed area of Big Lake embraces many thousand acres. It lies in the basin of the St. Francis river, and well-authenticated accounts say that the sinking of the earth's surface resulting in the

formation of the lake was caused by the New Madrid earthquakes of 1811 and 1812. It is quite certain that Little river, which enters at the north and has outlets at the south, pursues a well-defined channel along the western margin of the lake basin, and that the bed of the lake, so called, is marked by many stumps and fallen trees of kinds that are indigenous only to the uplands. When the survey of this section of the country was made by the national government in 1834, the surveyor's lines meandered the outer margin of the lake. The deeds to the complainants covering the strips of land along the meander lines also purported to convey to them as accretions the lands within the lines to the thread of the stream known as "Little River." The controlling questions in the case are: Is Little river a distinct stream running along the western margin of the lake basin, and is it navigable or unnavigable? Where are the thread of the stream and the eastern line of its bed? Is Big Lake a part of Little river, and is it navigable, or is it in such condition that it should be said to have become through accretion or reliction a part of the surveyed lands along the eastern meander line? A solution of these questions determines the rights of the contending parties.

Ulysses S. Bratton and Harry H. Myers, for appellants.

John I. Moore and J. F. Gautney (W. J. Driver and A. G. Little, on the brief), for appellees.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

HOOK, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The shores of navigable waters and the soils under them were not granted by the Constitution to the United States, but were reserved to the states respectively; and the new states upon their admission to the Union have the same rights in respect thereof as the original states. As to lands bounded on unnavigable waters the United States assumes the position of a private owner subject to the general law of the state so far as its conveyances are concerned. In either case the question whether the title to the soil under the waters passes to the grantee of the shore land is determined by the law of the state where the land lies. Hardin v. Shedd, 190 U. S. 508, 519, 23 Sup. Ct. 685, 47 L. Ed. 1156, and cases there referred to.

In Arkansas a riparian owner takes all accretions, whether the water course be navigable or not. Warren v. Chambers, 25 Ark. 120, 91 Am. Dec. 538, 4 Am. Rep. 23. His title extends to the thread of an unnavigable stream. In the case of a navigable stream the title to the bed is in the state for the use of the public, and the riparian proprietor owns only to high-water mark or the limit of the bed. The bed of the river is that soil so usually covered by water that it is wrested from vegetation and its value for agricultural purposes is destroyed. It is the land upon which the waters have visibly asserted their dominion, and does not extend to or include that upon which grasses, shrubs, and trees grow, though covered by the great annual rises. Railway Co. v. Ramsey, 53 Ark. 314, 13 S. W. 931, 8 L. R. A. 559, 22 Am. St. Rep. 195, following Howard v. Ingersoll, 13 How. 381, 14 L. Ed. 189. See, also, Houghton v. Railroad, 47 Iowa, 370.

To meet the test of navigability as understood in the American law a water course should be susceptible of use for purposes of commerce or possess a capacity for valuable floatage in the transportation to market of the products of the country through which it runs. It

should be of practical usefulness to the public as a public highway in its natural state and without the aid of artificial means. A theoretical or potential navigability, or one that is temporary, precarious, and unprofitable, is not sufficient. While the navigable quality of a water course need not be continuous, yet it should continue long enough to be useful and valuable in transportation; and the fluctuations should come regularly with the seasons, so that the period of navigability may be depended upon. Mere depth of water, without profitable utility, will not render a water course navigable in the legal sense, so as to subject it to public servitude, nor will the fact that it is sufficient for pleasure boating or to enable hunters or fishermen to float their skiffs or canoes. To be navigable a water course must have a useful capacity as a public highway of transportation. Toledo Liberal Shooting Co.. v. Erie Shooting Club, 33 C. C. A. 233, 90 Fed. 680; Moore v. Sanborne, 2 Mich. 520, 524, 59 Am. Dec. 209; Morgan v. King, 35 N. Y. 454, 458, 91 Am. Dec. 58; Brown v. Chadbourne, 31 Me. 9, 1 Am. Rep. 641; Griffith v. Holman, 23 Wash. 347, 63 Pac. 239; Wethersfield v. Humphrey, 20 Conn. 218; Rowe v. Granite Bridge, 38 Mass. 344; Gaston v. Mace, 33 W. Va. 14, 10 S. E. 60, 5 L. R. A. 392, 25 Am. St. Rep. 848; Neaderhouser v. State, 28 Ind. 257; Rhodes v. Otis, 33 Ala. 578, 73 Am. Dec. 439; Railroad v. Brooks, 39 Ark. 403, 43 Am. Rep. 277.

It does not follow that, because a stream or body of water was once navigable, it has since continued and remains so. Changes may occur, especially in small and unimportant waters, from natural causes, such as the gradual attrition of the banks and the filling up of the bed with deposits of the soil, the abandonment of use followed by the encroachment of vegetation, and the selection by the water of other and more natural and convenient channels of escape, that work a destruction of capacity and utility as a means of transportation; and, when this result may fairly be said to be permanent, a stream or lake in such condition should cease to be classed among those waters that are charged with a public use.

The action of the government surveyors in meandering a body of water or in surveying its bed is to be considered as evidence upon the question of its navigability or unnavigability at the time; but it is not conclusive. The surveyors are invested with no power to foreclose inquiry into the true character of the water. If the United States has disposed of lands bordering upon a meandered unnavigable water course or lake, by a patent containing no reservations, and there is nothing else indicating an intention .to withhold title to the lands within the meander lines (Niles v. Cedar Point Club, 175 U. S. 300, 20 Sup. Ct. 124, 44 L. Ed. 171) it has nothing left to convey; and whether the title to the bed of the waters is in the state or passes to the grantee in the patent is determined by the local law. (Lamprey v. Minnesota, 52 Minn. 181, 53 N. W. 1139, 18 L. R. A. 670, 38 Am. St. Rep. 541).

It is the settled doctrine of this court that the finding of a chancellor upon conflicting evidence will be deemed to be presumptively correct, and will not be disturbed on appeal, unless an obvious error has occurred in the application of the law or a serious mistake has been made

in the consideration of the evidence. Thallmann v. Thomas, 49 C. C. A. 317, 111 Fed. 277. Courts take judicial notice of the navigable character of our important rivers and inland lakes—those that are so within our common knowledge; but there are many of such insignificant capacity and doubtful utility that the question, being one of fact, is to be determined by the evidence produced, and in such case the burden of proof rests upon him who asserts the existence of the public servitude.

The record before us is very voluminous, consisting, as it does, of more than 900 pages. Many witnesses testified upon each side, and there is much conflict in their testimony, more especially concerning the character of the waters, whether navigable or no, and whether there is a defined eastern shore line of Little river, from which Big Lake swells to the eastward as an unnavigable swamp. But, applying the foregoing principles of law to the facts of this case, and bearing in mind the conclusions reached by the trial court and their influence in the determination by this court of disputed questions of fact in a suit in equity, our opinion is that the decree should be affirmed. Whatever may have once been the capacity and utility of the body of water known as "Big Lake" as a highway of commerce or in the floatage of the products of the fields and forests along its banks, the conditions that are to be considered are those of recent years and the present. The capacity of a lake or stream for navigation may be permanently lost from natural causes. Its annual influx of waters may be greatly lessened by works lawfully carried on by the government in the improvement of other natural highways of commerce. Accretion and reliction may work such a complete change that the bed of what was once a navigable body of water may be rapidly approaching that condition which makes it available for the plow. It is a matter of common knowledge that with the construction of levees and drains, and the confining and deepening of the channels of great navigable streams, large areas of land are being rescued from the waters and made useful for grazing and the pursuits of agriculture. Small and unimportant streams and lakes, that partake of the character of swamps during the greater part of the year, may permanently lose whatever occasional navigable capacity they once possessed by the discontinuance of the attention of the government and its improvement of other more capacious and more useful highways of commerce. Through the gradual deposits of silt, the increase of vegetation, and the lessening of the annual volume of water, probably due in large measure to the levee improvements in the valley of the Mississippi, there has been, according to the observation of witnesses, a continuous and progressive upgrowth of the bed of the Big Lake basin; and it is confidently asserted by some that it would soon be available for farming purposes if the outlets of Little river, through which the waters of the lake are discharged at its southern end, were cleared of obstructions. For some years prior to the trial of this case Big Lake has possessed none of the characteristics of real commercial usefulness as a navigable thoroughfare. The sunken basin into which the waters in Little river overflow rises so gradually to the eastward that there are no landing places on the eastern shore. The photographs taken from different points of view and the testimony of the witnesses

148 F.—50

show it to be largely a tangled jungle, choked with willows, aquatic growth, and dead trees and stumps. Navigability, in the sense in which the term is used in the law, is not established by proof that during the rainy season the waters rise so that boats of small draft may go here and there by "riding down the willows," or that there are here and there inlets of deeper water that penetrate the tangled growth. These inlets cannot in any true sense be termed useful highways of commerce. They are for the most part tortuous, lacking continuity, and, so to speak, end nowhere. Navigation of them, except with canoes, skiffs, and dugouts, is fraught with hidden dangers, even in the times of highest water; and the use that may be and is made of them is not that which is contemplated by the law for the creation of a public easement.

During the greater part of the year the bed of the lake appears to view, excepting where the deeper depressions allow the waters to stand in scattered pools. There are then seen extensive fields of grass between the higher wooded portions, upon which horses and cattle are pastured and hogs are run for several months in the year. Vehicles are driven over the dry bed, and roads thereon are worked by the citizens. Near the south end a highway is marked upon the maps as crossing the lake. Dead trees and stumps still show the effects of a fire that ravaged the lake basin more than 30 years ago. In recent years efforts at navigation by those means that would have a tendency to show a navigable character and capacity of the water have generally met with disaster. The evidence fully justifies the finding that that part of the area indicated upon the maps and exhibits as being the bed of Big Lake, which extends from the eastern meandered line westward to the east line of Little river, has, by process of accretion and the reliction of the waters, become a part of the patented lands along the eastern margin.

Webster v. Harris, 111 Tenn. 668, 69 S. W. 782, 59 L. R. A. 324, involved the navigability of Reelfoot Lake, in Tennessee, near the Mississippi river. The basin of this lake was doubtless created by the same convulsion of nature that resulted in the sunken lands of Missouri and Arkansas. The physical characteristics of Reelfoot Lake are similar to those shown in the record before us. There is the same aspect of desolation, of dead trees, logs, stumps, snags, and other obstructions. But the depth of the irregular open areas between the higher points of land at ordinary low water exceeds that of Big Lake at flood, and the court held that, though Reelfoot Lake was not navigable in the legal sense, nevertheless, as it possessed capacity for valuable floatage, and for rafts, flatboats, and perhaps small vessels of light draft, it was navigable "in the common acceptation of the term," and that therefore the title to the bed thereof was in the riparian owners, subject to the easement of the public for commercial intercourse and transportation, though, if it had been navigable in the legal sense, the title to the bed would have been in the state for the use of the public. This distinction in respect of the kinds of navigability and the resultant effect upon the title to the soil under the waters do not obtain in Arkansas.

Little river has a well-defined bed, largely free from vegetation and obstruction, running along the western margin of Big Lake basin. There is no controversy about the western line of its bed, and the evidence fairly establishes that the eastern line thereof is defined and marked by higher points of land lying to the eastward, by the stumps and fallen trees of varieties indigenous only to the uplands, and by willows and aquatic growth. We also approve of the conclusion of the trial court that Little river is not navigable in any real and substantial sense. Witnesses testified that in times of high water there has been no successful navigation of it in recent years, except with a gasoline launch drawing but a few inches of water, and with canoes, skiffs, and dugouts of the hunters and fishermen; that it is not being used to float the products of the fields and forests to market, and cannot be profitably and successfully used for that purpose. And, if practical adaptability and usefulness are the tests, the finding of the court under the evidence was right. The line of division between the lands on the east and those on the west established by the decree was the center line of Little river, which was described with reference to natural monuments as definitely as was practicable.

The decree is affirmed.