MINTZER et al. v. NORTH AMERICAN DREDGING CO.

(District Court, N. D. California, Second Division. August 28, 1916.)

No. 184.

1. NAVIGABLE WATERS ☞39(4)—RIGHTS OF RIPARIAN OWNERS—IMPROVEMENT OF CHANNELS.

Whatever may be the rights of riparian proprietors in the land underlying a navigable stream below mean high-water line, they are held in subordination to the public right of navigation and the coincident right to employ all appropriate means to improve the channel for such purpose.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 21.]

2. NAVIGABLE WATERS ☞37(7)—LANDS UNDER WATER—CONSTRUCTION OF GRANT.

Where the state granted a tract of marsh or tide land, which was intersected by many tidal sloughs or creeks, some of considerable magnitude and others dwindling to mere ditches or rivulets, and neither the channel of one of such streams nor the land underlying it was excepted from the grant, the grantee had a valid legal title to the land through which the stream ran, including the soil underlying the channel, even though the stream was navigable.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 212-215.]

3. NAVIGABLE WATERS ☞39(4)—RIGHTS OF RIPARIAN OWNERS—IMPROVEMENT OF CHANNELS.

Even for the purpose of improving a stream for purposes of navigation, there is no right to take and carry away the soil underlying the stream and belonging to the riparian proprietor without compensation, and to sell it to another for the betterment of his land.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 21.]

4. EVIDENCE ☞10(5)—NAVIGABLE WATERS ☞1(7)—EVIDENCE OF NAVIGABILITY—JUDICIAL NOTICE.

While courts take judicial cognizance of the navigable character of large and well-known bodies of water, as to those of a more insignificant character, the history and nature of which are less known, the fact of navigability must be established by evidence, and the burden of proof rests on the party asserting that character.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 13; Navigable Waters, Cent. Dig. §§ 12-15.]

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

5. NAVIGABLE WATERS ⊜⟂1(3)—TEST OF NAVIGABILITY.

The mere depth of water does not place a stream in the category of a navigable waterway, other essentials being absent; nor will the want of depth or capacity in part of its course take a stream out of that category, if the other characteristics are present.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 7.]

6. NAVIGABLE WATERS ⊜⟂1(4)—TEST OF NAVIGABILITY.

That a stream is one in which the tide ebbs and flows does not necessarily tend to demonstrate its navigable character.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 8.]

7. NAVIGABLE WATERS ⊜⟂1(1)—WHAT CONSTITUTES—NAVIGABLE STREAM.

A tract of marsh or tide land, largely submerged at flood tide, was intersected by many tidal sloughs or creeks, one of which was, in its lower reaches, as wide as 100 feet or over, with a depth of from 2 feet or less at low tide in its shallowest parts to approximately 7 or 8 feet at its flood, and deepening somewhat towards its mouth. A grant of such lands did not except such stream, and it had never been meandered by the state, or designated as a navigable stream by statute. It had never been used or regarded as navigable, other than for duck boats or punts for hunting and fishing, until within a few years, when an oil company established a plant on adjoining land, and on a few occasions took small amounts of material to its plant on the flood tide by power boats and scows of light draft. It ran wholly through unimproved private property, and was not accessible or available to the public, or to any private industry other than the oil company's plant, and, though within the corporate limits of a city, it was at least a quarter of a mile from the nearest established street. *Held*, that it was not a navigable stream, which could be improved for purposes of navigation against the wishes of the riparian proprietor.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 5, 11, 16.]

In Equity. Suit by Lucio M. Mintzer and others against the North American Dredging Company, in which the City of Richmond intervened. Decree for plaintiffs.

J. K. Johnson and W. P. Johnson, both of San Francisco, Cal., for plaintiffs.

D. J. Hall, of Richmond, Cal., for intervener.

Earl D. White, of Oakland, Cal., for defendant.

VAN FLEET, District Judge. This is a bill to enjoin the defendant from further proceeding to dredge out and deepen a certain waterway or channel traversing lands alleged to belong to the plaintiffs' testator, and from carrying away the earth or soil therefrom, as constituting a willful and malicious trespass and waste, and to recover damages for the waste and injury already done.

The answer of the defendant denies any ownership or right of any kind in the plaintiffs in the land involved, and sets up that the channel in question is "known and designated as the south channel of the San Pablo Canal, all within the city limits of the city of Richmond, county of Contra Costa, state of California, and that said channel is, and has been for many years last past, a navigable waterway, with a public terminus, connecting the said city of Richmond with the San Pablo Bay and the Bay of San Francisco," and that "for many years last

past vessels engaged in commerce have navigated and traversed said channel"; that all the acts done and committed by defendant, of which complaint is made, have been had and done under and in pursuance of a contract theretofore entered into between defendant and said city of Richmond, whereby "defendant agreed to dredge a channel eighty (80) feet wide, in and through said south channel of said San Pablo Canal, to a uniform depth of eight (8) feet below low tide," and that the work of dredging said channel was being done by defendant "for the purpose of improving said waterway in the interest of commerce and navigation," etc.   It denies that plaintiffs have suffered any damage, or that defendant "has committed any willful or malicious or any trespass upon any property of plaintiffs."   It then alleges, as ground of affirmative relief, that after defendant had removed approximately 22,000 cubic yards of material from said channel it was stopped by the injunction issued herein, and has since discontinued work under said contract, and that by reason of such interruption and delay in its work defendant has suffered damages on its part, for which it asks judgment against the plaintiffs.

The city of Richmond was permitted to file a bill of intervention, in which it alleges that the channel in question is a natural arm of San Pablo Bay, which is a navigable body of water within the state; "that the depth of water in said channel varies with the rise and fall of the tide, and that at ordinary low tide said channel has a minimum depth of two (2) feet, and at ordinary high tide has a minimum depth of eight (8) feet"; and, after alleging substantially in the terms set up in the answer the navigation of said channel during recent years between other points and the city of Richmond, it is alleged that in order to improve the navigability of the channel and render it more suitable for commerce "it became and is necessary to deepen said channel, throughout its entire length to a width of eighty (80) feet and to a depth of eight (8) feet at ordinary low tide."   It is alleged "that the city of Richmond has a population of 20,000 or upwards, and contains within its limits a large number of extensive manufacturing plants and industries; that it is essential for the best interests of the city of Richmond, its inhabitants, and the public generally that the navigability of said channel be improved and increased as aforesaid, thereby affording better transportation facilities for the city of Richmond, its inhabitants, and the public generally."   It admits the entering into the contract as set up by defendant for the deepening and widening of the channel, and alleges that it has procured for that purpose a permit from the War Department of the United States for such improvement.   It denies any right or title in plaintiffs in or to the premises involved, or that any soil or other thing of value is being taken from plaintiffs' property.

In response to the bill of intervention the plaintiffs filed an answer, denying all its allegations as to the navigability or commercial value of said channel, and alleging that the intervener and the Standard Oil Company of California have entered into a contract "whereby it was agreed that the city of Richmond should cause the dirt or soil dredged or taken from the property of plaintiffs to be deposited upon the property of the Standard Oil Company of California, and that it should

pay to the city of Richmond 10.74 cents per cubic yard therefor, that being the exact price that the city of Richmond agreed to pay the defendant herein, North American Dredging Company of Nevada, for dredging said alleged channel as aforesaid, and that the aim and purpose of said agreement between the Standard Oil Company and the city of Richmond was that the Standard Oil Company should pay for said dredging, and thereby receive and obtain the property of plaintiffs without paying them therefor." And it is alleged that, if said channel is deepened in accordance with the contract between the intervener and the defendant, "it will enable the Standard Oil Company of California to obtain a waterway to the San Pablo Bay over and across and upon the land and property of plaintiffs." There is a further allegation that the city contemplates using the dredged channel as an open sewer; but no evidence was offered on the subject, and it may be disregarded.

The evidence shows that the channel in question, which is about a mile in length, runs in its entire course through a tract of salt marsh or tide land, comprising some 500 acres more or less, having its northerly boundary on San Pablo Bay, and extending southerly for a distance of a mile, more or less, between a natural waterway known as San Pablo Canal or creek, which borders it on the east, and the potrero or highlands, constituting the San Pablo peninsula, on the west. This land was acquired by Dr. Tewksbury, the grandfather of the plaintiffs, in the early '70s by grant from those holding patents from the state under the State Tide Land Act (Stats. 1867–68, p. 716; Stats. 1869–70, p. 541); and the title has been regularly transmitted to plaintiffs' testator, in whose estate it now rests. Like all lands of its character on the margins of the sea, its bays and inlets, it is subject to tidal action, being largely submerged at flood tide and mostly exposed at its lower stages. As disclosed on the map, and by a personal inspection made by the court, it is intersected by many tidal sloughs or creeks, cut by the flux and recession of the waters of the bay in their diurnal flow, some of them of considerable magnitude, and others dwindling to mere ditches or rivulets. At the height of the tide many of these sloughs have a considerable depth of water, while at its lowest stages, in most of them, the mud bottom lies exposed, or practically so. The particular channel in controversy branches from San Pablo Canal or creek, a stream of much greater magnitude, a short distance south from where the latter debouches from the marsh land into San Pablo Bay, and thence winds its way in a general southerly direction throughout the length of the tract of land above described. It varies in width and depth, being in its lower reaches as wide as 100 feet or over, and narrowing somewhat farther south, with a depth, dependent upon the state of the tide, of from two feet or less at low tide in its shallowest parts toward the south, to approximately seven or eight feet at its flood, and deepening somewhat as it flows to its mouth and enters the San Pablo Canal.

Neither the channel nor the land underlying it was excepted from the grant by the state to its patentees of the tide lands through which it runs, nor in the deeds from the latter conveying the title to plaintiffs' ancestor, nor is the channel in any way referred to or mentioned in said

conveyances; nor, so far as appears, has it ever been meandered by the state or designated among the streams or waterways declared navigable in its statutes. While referred to in the answer as the "south channel of San Pablo Canal," it bears no name or designation on the official map. At the time Dr. Tewksbury acquired these tide lands and for many years thereafter there was no settlement in the immediate neighborhood, the contiguous highlands being devoted to farming and grazing, for which latter purpose the marsh lands were included so far as available. It was for this purpose, apparently, that Dr. Tewksbury acquired the marsh lands. He owned a large acreage in the adjacent highlands, and the evidence shows that shortly after the acquisition of the marsh lands he constructed a dyke across them near their northern boundary to keep out the tide and render the land more available for pasturage; much of the grasses growing thereon making good food when the waters were kept out. This dyke, but for a tide gate therein, was built solidly across the channel in question, and the evidence tends to show that it was maintained for many years—as late as 1901—in a condition efficient to restrain the influx of the tide and render the lands more available for pasturage of cattle. Since then the dyke has largely disappeared and no longer obstructs the channel, although evidence of its existence remains. During all these years, while San Pablo Canal was navigated to some extent, the channels and sloughs intersecting these lands, including the one in controversy, were never used or regarded as available for any species of navigation, other than for duck boats or punts for hunting and fishing; no larger craft ever attempting to traverse them. This condition continued down to about the year 1900 or a little later. About that time the Santa Fé Railroad determined on Point Richmond as a terminus on San Francisco Bay, and immediately thereafter the town or city of Richmond sprang up. The latter is built upon the highlands to the south and west of the marsh lands in question, and these highlands, extending northerly in a peninsula terminating in San Pablo Point, partially divide the waters of San Pablo Bay from the Bay of San Francisco, of which it constitutes an arm. When incorporated some years since, the corporate limits of the town were made to include this body of tide lands; but the latter remains unreclaimed and unimproved, except by the Standard Oil Company as hereinafter stated. The town has now grown to a place of considerable population and commercial importance, with a deep water harbor on the eastern shore of the Bay of San Francisco.

Some years since the Standard Oil Company of California established a refining plant at Richmond, its site covering a considerable acreage of highland and including a portion of tide or marsh land purchased by it from plaintiffs' testator off the southerly end of the tract above described. At that time the slough or channel in question continued into or through the portion of the marsh land acquired by the Oil Company, but the latter has since built a levee or bulkhead across the channel and along the northern boundary of its marsh lands, and has either wholly or partially filled in the channel where it crosses its land. Immediately north of the marsh land sold to the Oil Company is an unimproved strip of land, about 200 feet wide, sold by the plaintiffs' predecessors to the Belt Line Railroad, which narrow strip runs across the

marsh between the lands of the Oil Company and the present holdings of the plaintiffs, forming the southerly boundary of the latter and the northerly boundary of the former. It is only since the establishment of the Oil Company's works that any effort has been made to navigate the channel by craft of burden, and the evidence shows in that regard that upon some few occasions power boats and scows of light draft have been taken up through San Pablo creek or Canal and into this channel on the flood tide, carrying some small amount of material for the use of the Oil Company; but it was found that, excepting at such periods of high tide, it was impracticable to put the channel to such use without deepening it for the purpose. Accordingly the dredging work which the bill seeks to stop was commenced in 1915, as the result of an arrangement between the Oil Company and the city, whereby the latter contracted with the defendant to do the work of dredging the channel as set forth in the pleadings, and the Oil Company, in consideration of the removed soil being deposited on its land within its levee or bulkhead, contracted with the city to pay it the same price per yard for the material dredged which the city was to pay the defendant for its removal. Upon the theory that the channel constituted a public navigable waterway, and its improvement a benefit to navigation, a permit from the officers of the War Department for the prosecution of the work was procured. The dredging operations were commenced at the levee or bulkhead of the Oil Company, working northerly, and some 900 feet or over of the channel at the south end had been dredged, and about 22,000 cubic yards of material removed, when stopped by the preliminary injunction procured by the plaintiff.

[1, 2] 1. The presentation of the case by the defendant and the intervener proceeds largely, if not entirely, upon the theory that its determination turns solely upon the question whether the channel involved is a navigable waterway, which they affirm it to be, and as such subject to improvement by the authorities for the benefit of commerce and navigation. Of course, if it is a navigable stream, there can be no question that, whatever may be the rights of the plaintiffs as riparian proprietors in the land underlying the stream below mean high-water line, they are held in subordination to the public right of navigation, and the coincident right to employ all appropriate means to improve the channel for such purpose. Willink v. United States, 240 U. S. 572, 36 Sup. Ct. 422, 60 L. Ed. 808; Greenleaf-Johnson Lumber Co. v. Garrison, 237 U. S. 251, 35 Sup. Ct. 551, 59 L. Ed. 939. But, under the circumstances disclosed here as to the arrangement under which the work sought to be enjoined is being done and the dredged material disposed of, a question arises whether the rights of the plaintiffs are not being unlawfully invaded, independently of the consideration whether the channel in question is or is not navigable. That the evidence is sufficient to show a valid legal title in the plaintiffs to the land through which it runs, including the soil underlying the channel itself, is not challenged in the argument, nor is the proposition open to dispute. Knudson v. Kearney, 171 Cal. 250, 152 Pac. 541, and cases there cited. Nor is there any question that it is for the state to determine whether she will part with the title to the lands underlying her waters, navigable or otherwise, and vest it in private ownership. Donnelly v.

United States, 228 U. S. 243, 33 Sup. Ct. 449, 57 L. Ed. 820, Ann. Cas. 1913E, 710.   In that case it is said (228 U. S. 261, 33 Sup. Ct. 454, 57 L. Ed. 820, Ann. Cas. 1913E, 710):

"In Barney v. Keokuk, 94 U. S. 324, 338 [24 L. Ed. 224] it was held that it is for the states to establish for themselves such rules of property as they may deem expedient with respect to the navigable waters within their borders and the riparian lands adjacent thereto.  *  *  *  If they choose to resign to the riparian proprietor rights which properly belong to them in their sovereign capacity, it is not for others to raise objections."

And it is further said (228 U. S. 262, 33 Sup. Ct. 455, 57 L. Ed. 820, Ann. Cas. 1913E, 710):

"But it results from the principles already referred to that what shall be deemed a navigable water, within the meaning of the local rules of property, is for the determination of the several states.   Thus the state of California, if she sees fit, may confer upon the riparian owners the title to the bed of any navigable stream within her borders."

[3] Such being the law, we may assume for present purposes that this is a navigable waterway, for it nevertheless appears that the plaintiffs own the soil underlying it to the same extent and by precisely the same title as they hold the riparian lands upon its banks, subject only, as to the submerged soil, that their right is subordinate to the right of navigation, which may require its removal for the improvement of the stream.   But none of the cases hold, and it is not the law, that for such purpose, more than another, the soil of the riparian proprietor may be taken and carried away, without his consent and without compensation, and transferred to another in private ownership.   And yet that is what is being done under the arrangement by which the work in this instance is being carried out—the soil of plaintiffs being taken and deposited on the land of the Standard Oil Company for the betterment of the latter.   It is not a question of the value of the thing taken, but one of ownership of property rights.   Whatever the value may be, property cannot be thus taken without compensation.   It would seem, therefore, that the plaintiffs are entitled to have the removal and appropriation of their soil, as disclosed in the evidence, stopped, independently of the question of the navigability of the stream.

[4-6] 2. But do the facts show this channel to be a navigable waterway, in the sense and for the purpose contended for?   This is largely a question of fact, to be determined from the character of the stream, its situation and availability as a highway of commerce, and the other surrounding circumstances affecting the question.   While courts take judicial cognizance of the navigable character of large and well-known bodies of water, like our Great Lakes, or of streams like the Mississippi or Ohio, as to those of a more insignificant character, the history and nature of which are less known, the fact of navigability must be established by evidence, and the burden of proof rests on the party asserting that character.   Harrison v. Fite, 148 Fed. 781, 78 C. C. A. 447.   The mere depth of water will not place a stream in the category of a navigable waterway, other essentials being absent; nor, on the other hand, will the want of depth or capacity in part of its course take a stream out of that category, if the other characteristics are present.

Nor does the mere fact that it is a stream in which the tide ebbs and flows necessarily tend to any extent to demonstrate its navigable character. As stated by Chief Justice Shaw in Rowe v. Granite Bridge Co., 21 Pick. (Mass.) 344:.

"It is not every ditch, in which the salt water ebbs and flows, through the extensive salt marshes along the coast, and which serve to admit and drain off the salt water from the marshes, which can be considered a navigable stream. Nor is it every small creek, in which a fishing skiff or gunning canoe can be made to float, at high water, which is deemed navigable. But, in order to have this character, it must be navigable to some purpose useful to trade or agriculture. It is not a mere possibility of being used under some circumstances, as at extraordinary high tides, which will give it the character of a navigable stream, but it must be generally and commonly useful to some purpose of trade or agriculture."

The essentials of a navigable stream or waterway are thus stated by the Circuit Court of Appeals for the Eighth Circuit in Harrison v. Fite, supra:

"To meet the test of navigability, as understood in the American law, a water course should be susceptible of use for purposes of commerce or possess a capacity for valuable floatage in the transportation to market of the products of the country through which it runs. It should be of practical usefulness to the public as a public highway in its natural state and without the aid of artificial means. A theoretical or potential navigability, or one that is temporary, precarious, and unprofitable, is not sufficient. * * * Mere depth of water, without profitable utility, will not render a water course navigable in the legal sense, so as to subject it to public servitude, nor will the fact that it is sufficient for pleasure boating, or to enable hunters or fishermen to float their skiffs or canoes. To be navigable a water course must have a useful capacity as a public highway of transportation."

In People v. Economy Light & Power Co., 241 Ill. 290, 324, 89 N. E. 760, 768, it is said:

"To hold that the state can by artificial means make a stream navigable which in a state of nature was not navigable, and thereby deprive riparian owners of their property rights in the bed of the stream, is simply to hold that private property may be taken * * * for public use without compensation."

See, also, Chisolm v. Caines (C. C.) 67 Fed. 285; Leovy v. United States, 177 U. S. 621, 20 Sup. Ct. 797, 44 L. Ed. 914; Wilson v. Prickett, 79 Wash. 89, 139 Pac. 754.

In his work on Irrigation and Water Rights, Mr. Kinney, treating of navigable waters, states (volume 1, p. 570) the principle that:

"A stream which can only be made navigable or floatable by artificial means is not a public highway."

And at page 567 the author says:

"In order to be a public body of water, it must be accessible to the public, and have a terminus by which the public can enter it and another from which they can leave it. Hence creeks which open in navigable waters, but merely lead into private lands, are not public navigable waters."

[7] When these principles are applied to the facts in this case, it is quite apparent, I think, that the latter are lacking in several essentials required to constitute this slough a public navigable waterway. As we have seen, it has never been in fact navigated in any true sense, and

has not been treated or considered, either by the public or by the state, as capable of navigation. While this lack of recognition by the state is not conclusive, it is nevertheless not without potency as a fact in its bearing on the question, since it is not to be lightly presumed that the state will part with its title to property of known or recognized value for public use. But, in the next place, the conceded necessity of the work sought to be prosecuted is a recognition that the channel is not susceptible of being navigated in its present state without artificial aid. And the facts, I think, sufficiently demonstrate that this work, instead of being intended for the improvement of a navigable stream, is really intended to render navigable a stream not so in its natural state. Nor does the evidence show that the channel is or will be in any true sense useful to the public for the purpose of navigation. It is true it is now within the corporate limits of the city of Richmond, which in that sense may be said to constitute a public terminus. But, as the evidence shows, it lies only at its "back door," so to speak, runs wholly through private property, and is so situated that its use is, and so far as appears can be, available only to the Oil Company and the Belt Railroad, should the latter see fit to construct an approach. It is not accessible or available to the public, nor to any other private industry; the evidence showing that the nearest established street of the town is at least a quarter of a mile from its southern terminus. Under the principles above stated, I am satisfied that the court would not be justified upon the facts in holding this channel to be a navigable stream.

It results that a decree must go in favor of the plaintiffs, enjoining the further prosecution of the work in question, and awarding them such damages as they may have suffered, with their costs. Should the amount of the damages not be agreed upon, a reference may be had for its ascertainment.