### UNITED STATES v. RHODES et al.

(Circuit Court of Appeals, Eighth Circuit. January 8, 1925.)

No. 6578.

1. **Waters and water courses ⬅111—Existence of lake and substantial accuracy of meander line held established by evidence.**

Evidence considered, and *held* to sustain a finding that a lake meandered by the government surveyors was in fact a lake containing a permanent body of water when the survey was made and when the adjoining lands were patented, and that the meander line was substantially accurate.

2. **Appeal and error ⬅931(1), 1011(1)—Findings of fact, made on conflicting evidence, presumed correct.**

Findings of fact by the trial court on conflicting testimony are presumptively correct, and will not be disturbed, unless the appellate court is convinced that there has been an obvious error in the application of the law or a serious mistake as to the facts.

3. **Waters and water courses ⬅111—Riparian rights attach to lands granted bordering on meandered lake.**

If a lake was a permanent body of water in a defined basin at the time the United States parted with its title to the lands surrounding it, and if the meander line was properly run, riparian rights attached under the state law, and became vested in the patentees and their grantees.

4. **Public lands ⬅106(1)—Executive department without jurisdiction over patented lands.**

After the United States has parted with its title to public lands, the executive branch of the government loses all jurisdiction to deal with the subject-matter, and the Land Department can make no order that will affect rights which had become vested in the grantees.

Appeal from the District Court of the United States for the Eastern District of Arkansas; Jacob Trieber, Judge.

Suit in equity by the United States against J. W. Rhodes and others. Decree for defendants, and the United States appeals. Affirmed.

George A. H. Fraser, Sp. Asst. Atty. Gen., for the United States.

Sam Costen and Wils Davis, both of Memphis, Tenn. (Z. B. Harrison, of Blytheville, Ark., on the brief), for appellees.

Before SANBORN and LEWIS, Circuit Judges, and KENNEDY, District Judge.

LEWIS, Circuit Judge. Appellant brought this suit in July, 1920, against appellees, alleging in its bill that it is the owner of 3,265 acres of described land in Mississippi County, Arkansas, that in 1917 and 1918 it caused these lands to be surveyed and in May, 1920, opened them to homestead entry, that entrymen had gone upon them and their possession was being interfered with by appellees, that appellees by virtue of certain deeds and conveyances to them claimed to be the owners of various fractional sections lying opposite and contiguous to the 3,265 acres and by reason of their claims of ownership of said fractional sections they severally claimed to own the lands in controversy. The bill further charges that none of the appellees has any valid claim to or interest in appellant's said lands. It prays that its title be quieted as against appellees and that they be enjoined from further interference with homestead settlers. Appellees as their defense set up title in themselves to the lands as riparian owners, they claim that the lands sued for were the bed of Golden Lake, a permanent body of water, that it was meandered 75 years before this suit was brought by Government surveyors, that the meander line conformed to the water line and allege that they own the fractional sections surrounding the old lake. They allege that they are the remote grantees of the United States of these lands surrounding the lake and prayed that the bill be dismissed. On final hearing their

prayer was granted, and plaintiff below has appealed from that decree of dismissal.

[1] There were two issues of fact to which all of the testimony was directed: Were the lands the bed of a lake, and if so, Was the meander line correctly laid down. On both inquiries the record takes us back and attempts to disclose conditions that existed one hundred years ago. As early as 1823 the Government began the survey of townships around the lake for subdivision, and when the lines then being run reached the lake the surveyor noted that fact, Golden Lake, or Golden's Lake, and set a meander corner. This was continued in 1839 and 1844, additional meander corners being set, and in the last-named year a meander line was run around the west side of the lake. In 1846 another surveyor set additional meander corners and finished running the meander line around the lake. In doing this he relocated some of the meander corners that had theretofore been set. Three different surveyors had participated at different times in setting the meander corners and running the meander line. According to the official reports which they made, a body of water of irregular contour, by them platted and reported as Golden Lake, had been meandered out, approximately 3½ miles by 2½ miles in dimension. Title to the townships surrounding the lake passed from the United States by patent, describing them in accordance with the official survey, to the State of Arkansas pursuant to the Act of September 28, 1850, 9 Stat. 519, and from the latter to appellees as remote grantees. The evidence indicates that at the times of the surveys and thereafter for many years the west bank of the Mississippi River was a mile or more east of the east side of the lake; it also strongly supports the claim that the lake was what is known as an oxbow lake, that is, the river centuries ago had its channel in elbow form through the lake bed, later it cut through a new channel on the chord of the bow and the two ends of the abandoned channel became sealed up with silt, thus forming the lake. The weight of the evidence is to the effect that the upper end of an abandoned channel will fill before the lower end becomes filled; and this theory of the lake's formation is borne out by the fact that Barney's Bayou had been an outlet for the high waters of the lake, extending from its extreme southern end southeastward for about three miles to the Mississippi River. The bayou also fed the lake from the river when the latter was high. This is evident from the fact that the bayou, in carrying the muddy waters of the Mississippi into the lake, built up along its sides levees extending from the river well into the lake, the levees gradually dying out in the lake waters. That centuries have passed since the beginning of the slow process of building up these levees along the bayou is evidenced by the fact that live hardwood trees two and three hundred years old are found on these levees. This bayou is believed by some of the witnesses to be the unfilled part of the lower end of the old river channel. But it continued to fill where it entered the river and along its lower end, so that in the memory of living witnesses it carried water from the river into the lake only when the river was high, and as the river went down the outward flow would begin and then cease. Witnesses testified that they had seen the contrary flows under the conditions named. Some of appellant's witnesses ventured the opinion that there was not an oxbow lake at this place, that they were sunk lands caused by the earthquake of 1811, and in support of that theory called attention to the trunks of large hardwood trees submerged and thus preserved in the bottom of the lake, which, they said, were thrown down by the earthquake shock and subsidence of the land. We think it equally reasonable to say that these trees were brought in by the river flow.

Before coming to weigh the testimony of witnesses who expressed their opinions on whether there was a permanent body of water known as Golden Lake when the surveys were made and title passed from the Government, we call attention to other material facts to be borne in mind in considering the weight to be given to that testimony. Several miles below Golden Lake there was another sharp bend of the river to the west, known as Devil's Elbow. In 1876 the river cut across this bend and made a short channel, thus eliminating 25 miles of flow around the bend. The evidence is convincing that this caused a lowering of the waters in Golden Lake. Prior to that time, during high water in the river, there would be an overflow from the river into the eastern side of Golden Lake along what was said to be approximately the upper end of the old channel. After the cut-off at Devil's Elbow that overflow into the lake did not occur for several years. About 1894 St. Francis Levee was built between Golden Lake and the river, extending south across Barney's Bayou. That prevented both the overflow of the lake bank and the flow of water into the lake through Barney's Bayou. During extreme-

ly high water in 1912 and 1913 the levee broke and the river again flooded over the lake bank. Before the building of St. Francis Levee the western bank of the river had caved, and slowly extending westward had cut into the lake. There is testimony by witnesses who have known the lake since about 1865 and have been familiar with it during all subsequent years that there has never been as much water in it since the happening of the things just noted. About 1910 the lake area, with a large amount of other territory thereabout, was included in a drainage district, and about 1913 or 1914 the drainage of the lake was completed. Canals 20 to 25 feet on the bottom, 30 to 40 feet wide on top, and from 7 to 10 feet deep were constructed through the surrounding rim into the lake. They are capable of discharging in 50 hours water one foot in depth covering 4,000 acres, and since their completion the lake has been comparatively dry. In 1911 the appellant sent one of its agents, competent for that purpose, to make an investigation of the lake area and report whether, in his judgment, appellant had any claim to the land covered by the lake. This was before the drainage ditches were completed. He reported adversely to appellant's claim. But thereafter, in 1917 and 1918, as already said, appellant had the area surveyed and opened it to homestead settlement.

The record is voluminous. A large number of witnesses testified on each side, who lived near to or in the vicinity of the lake and knew the conditions there for a good many years, some of them as far back as 1865. It was always known as a lake. It was a fishing resort. Fish were shipped to market from it. Catfish 8 or 9 feet long were caught in it. In places the water was 10 to 12 feet deep at times, during their early recollection. Freight was carried across it in boats, logs were cut and floated across it; but the water gradually became of less depth for the reasons that have been stated and there was some filling of its bed from river floods. Some of the witnesses for appellant say there was a great deal more water 30 years ago and that the lake was then a reservoir for the whole country —a basin. A witness who had been familiar with it since 1865 said that when he first knew it it was all open lake and that condition continued until the building of the levee between it and the river. In dry seasons its waters would recede, but there is testimony that it would stand almost continuously at the same high level for 3 or 4 years

at a time. No one was found who could describe its condition prior to about 1865. The witnesses, particularly a large number of them who did not know the lake earlier than about 1875, are far from agreement as to the depth of the water and the area covered. But a witness who business required him to know the true conditions there in later years testified that after St. Francis Levee was built he had seen the water standing out to the meander line from excessive rains a number of times, and in some instances beyond that line, that he knew where the meander line was around the entire area and in late years had seen it in all stages of water. He was engaged in the construction of St. Francis Levee, had been connected with a great deal of drainage work in that territory and had handled approximately $10,000,000 worth of drainage and levee work. He was also engineer for the drainage district that constructed the canals into Golden Lake. The St. Francis Levee Board seriously considered constructing its levee around the lake on its western side, and he ran levels around it for that purpose. He testified that as to the elevation right at the meander line as you followed around, a difference could be observed inside and outside of the line at most places with the natural eye, but that at some places the slope is so gradual that you could not detect it in that way, and that there was a difference in timber growth inside and out very close to that line, that there were various small dornicks or ridges within the lake a few feet higher than other portions of it, that there was a difference in elevation between the land inside and outside of the meander line of from 10 to 12 feet, that the lake had a perceptible fill from sedimentary deposit, that a considerable part of the lake on the easterly side had caved into the river and that was the cause of the Levee Board considering construction of the levee around the lake, and that the nearer the river approached the lake the greater would be the seepage of water out of the lake into the river.

Different witnesses gave testimony substantially corroborating the testimony of this witness. Mr. Gauss, who was sent in 1911 by appellant to make an examination and report on conditions as to facts touching appellant's rights, was a witness for appellees. He testified that when he reached the lake on that mission there was a wide expanse of open water in front of it, that he did not retrace the meander line at that time but on later investigation he found that water in places extended out beyond that line,

that in places there were pronounced sloping banks, that in other places there had been cultivation across the meander line which tended to obliterate or lessen the slope, that there is an apparent difference in timber growth along the line, cypress, willow and locust predominating on the lake side and mixed hardwoods on the land side, that there were some hardwoods along Barney's Bayou, on Cane Island and Ash Island, but they formed only a small proportion of the timber in the lake, some hardwoods on a few other spots through the lake and some adjacent to the meander line where peninsulas have been cut off, but the extent of hardwood timber, as compared to the whole area, is insignificant, that he discovered a flourishing oak at an elevation of 1.5 feet above the line of permanent water, as indicated by the absence of timber, an elm 2.4 feet above the water line, a flourishing overcup oak on a small ridge .8 of a foot above the water line, and a 16-inch oak 1.6 feet above the water line. He gave several other instances of like character. He testified that the area in suit is some nine or ten feet deep, calculating from the rim of the basin around the lake. This rim, according to other witnesses, was from a quarter of a mile to half a mile out from the meander line, and he gave it as his opinion that Golden Lake was a lake in fact when he first saw it in 1911. After a careful consideration of the testimony we are convinced that the contention for appellant that the area in question was no more than overflowed lands is untenable, and that the only rational conclusion to be drawn from the testimony in the case is that Golden Lake was in fact a lake containing a permanent body of water in a basin, that this condition existed when appellant parted with its title to the lands surrounding the lake and continued for many years thereafter.

Surveyors were called as witnesses on each side. The meander line was approximately retraced. When the surveys were made in 1823 and on to 1846 the instruments used were not equal to those of the present-day in exactness, either as to course or distance. Some of appellant's witnesses claimed that along this line the dip was from the lake. Witnesses for appellees of equal competency testified to the contrary. Ecologists, dendrologists, botanists and foresters were called as witnesses by the parties, and again there was conflict. Those for appellant claimed that hardwood tree growth within the area and its age demonstrated that it or the greater part of it could not

have been a lake at the time the surveys were made. Those for appellees refuted this contention, and they claimed that the conditions found by them as to tree growth inside and outside the meander line demonstrated that the area was a lake in fact, and that the relocated meander line closely approximated the dividing line between water and land, as shown by trees tolerant of water on the lake side, and those intolerant of water on the land side, barring exceptional instances where comparatively few hardwoods were found on islands, a narrow peninsula or other slight elevations within the lake. Cypress was the prevailing growth, and some others less tolerant of water conditions. Some of the expert witnesses for appellees referred to the cypress an an aquatic or water-loving tree, while one for the appellant said there was no aquatic tree, that the cypress was a water-tolerant tree. The last expression is unopposed. It has been observed that on the levees on either side of Barney's Bayou, extending into the lake, hardwood trees of great age were found. There were two small islands in the lake on which hardwood trees were found and what was said to be a narrow peninsula extended into the lake, on which hardwood trees were found. At places in the lake swell-butt cypress, some of them ten feet in diameter at the base and centuries old, were found. There were slight elevations here and there, called dornicks, bearing tree growth intolerant of water conditions.

Appellant's witnesses testified that hardwoods were found growing inside the meander line and that they were of great age, antedating the survey. Appellees' witnesses admitted that this was true, but not to the extent claimed, and testified that the hardwoods were found on slight elevations above the usual water level, and that a foot or less above the level in that country was sufficient to produce and support hardwood growth. Some of appellant's witnesses, skilled in surveying and familiar with the rules governing the running of meander lines, criticised the manner in which that line was originally run, as relocated; and said that in their opinion it never conformed to mean high-water level. One of them, however, testified that he was really surprised at the accuracy of the work of those who had participated in the original surveys. Appellees' witnesses, possessing like qualifications, commended the accuracy of the original meander line and said that it had been properly run. After this suit was brought and the meander line relocated witnesses for each side fol-

lowed it. Some testified that in early years the water stood up the year around, and in a way actually conformed to the meander line as relocated. Others, that the water would not reach that line except in very wet seasons or in case of overflows from the river, when it would pass beyond that line and in some years spread out over all the surrounding country; and that in very dry seasons there was so little water that the fish could not live in the lake. But we are convinced there is a vast difference between the conditions within the memory of most of those witnesses and conditions antedating their time.

[2, 3] We cannot doubt that the water over this area has continuously become less from a time preceding the knowledge and reach of memory of any witness. The physical situation worked upon by natural forces has undoubtedly produced a great change in that respect since the original surveys were made. We can perhaps approximately conceive those conditions from the data given us by the expert witnesses. There was thus conflict between the witnesses on every issue of fact raised, they were fairly equal in number, at least there were several on each side; and under the familiar rule the findings of the lower court are here taken as presumptively correct and will not be disturbed unless we are convinced that there has been an obvious error in the application of the law or a serious mistake as to the facts. Savage v. Shields (C. C. A.) 293 F. 863; Harrison v. Fite, 148 F. 781, 78 C. C. A. 447. There is no disagreement between counsel as to the controlling principles of law to be applied here. They both say that those principles are fully stated in Lee Wilson & Co. v. United States, 245 U. S. 24, 38 S. Ct. 21, 62 L. Ed. 128; Id., 227 F. 827, 142 C. C. A. 351; (D. C.) 214 F. 630. If the lake was a permanent body of water in a defined basin at the time appellant parted with its title to the lands surrounding it, and if the meander line was properly run, then, under the State law, riparian rights attached and passed to subsequent grantees of the State, and those rights became vested in appellees.

[4] In 1915 the Commissioner of the General Land Office conducted a hearing on the issue which we have here, whether Golden Lake was in fact a lake, and whether or not it had been correctly meandered, and both questions were decided in favor of appellant; it was held that title to the area here involved was still vested in the Government. That decision is relied on. But the principle is firmly established that after the United States has parted with its title the executive branch of the Government loses all jurisdiction to deal with the subject-matter. The Commissioner and the Secretary of the Interior were without right or power to make any order that would in any manner or to any extent affect rights that had theretofore vested in appellees. Kean v. Calumet Co., 190 U. S. 452, 23 S. Ct. 651, 47 L. Ed. 1134; Lane v. Darlington, 249 U. S. 331, 39 S. Ct. 299, 63 L. Ed. 629; Hardin v. Jordan, 140 U. S. 371, 400, 11 S. Ct. 808, 838, 35 L. Ed. 428.

On the equity of the case Mitchell v. Smale, 140 U. S. 406, 412, 11 S. Ct. 819, 821 (35 L. Ed. 442), is against appellant:

"We think it a great hardship, and one not to be endured, for the government officers to make new surveys and grants of the beds of such lakes after selling and granting the lands bordering thereon, or represented so to be. It is nothing more or less than taking from the first grantee a most valuable, and often the most valuable part of his grant. Plenty of speculators will always be found, as such property increases in value, to enter it and deprive the proper owner of its enjoyment; and to place such persons in possession under a new survey and grant, and put the original grantee of the adjoining property to his action of ejectment and plenary proof of his own title, is a cause of vexatious litigation which ought not to be created or sanctioned. The pretence for making such surveys, arising from the fact that strips and tongues of land are found to project into the water beyond the meander line run for the purpose of getting its general contour, and of measuring the quantity to be paid for, will always exist, since such irregular projections do always, or in most cases, exist. The difficulty of following the edge or margin of such projections, and all the various sinuosities of the water line, is the very occasion and cause of running the meander line, which by its exclusions and inclusions of such irregularities of contour produces an average result closely approximating to the truth as to the quantity of upland contained in the fractional lots bordering on the lake or stream."

It is our opinion that the greater weight of the evidence is with appellees on the issues of fact, that the decision of the learned District Judge on the merits was equitable and right; and the decree appealed from is accordingly

Affirmed.