BARBORO *v.* BOYLE.

Opinion delivered June 21, 1915.

1.  RIPARIAN RIGHTS—NAVIGABLE AND NON-NAVIGABLE STREAMS.—The riparian owner upon a navigable stream, deriving title from the United States, takes only to high water mark, the title to the bed of the stream being in the State; the riparian owner upon a non-navigable stream is entitled to the center of it, ratably with the other riparian owners, the extent of his interest depending upon his frontage upon the stream. ·

2.  WATERS—NAVIGABLE WATERS.—A lake, formerly a part of the Mississippi river, seven miles in length, with an average depth of eighteen feet, but as deep as thirty-five feet in places, and a maximum width of two thousand feet, *held* to be a navigable lake.

3.  WATERS—RIGHT OF RIPARIAN OWNER TO LOWER LEVEL OF A LAKE.—Plaintiffs owned lands bordering upon a lake, the lake being connected with the river by a bayou. A levee district closed up the bayou with a levee, and the level of the lake rose five feet in consequence. *Held*, a riparian owner had the right to pump the water out of the lake so that the waters might be restored to their former level, and thus prevent the flooding of his land.

4.  GAME AND FISH—RIGHT OF OWNER OF ENCLOSED LAND.—The owner of enclosed lands has the exclusive right to hunt and fish upon the same, and he is entitled to equitable relief to prevent an interference with that right.

5.  GAME AND FISH—ENCLOSED LAND—NATURAL BARRIERS.—Whether or not a natural barrier may be of such a character as to serve as part of an enclosure, within the meaning of the statutes granting to the owner of enclosed lands the exclusive right to hunt and fish upon the same, is a question of fact, for each particular case, and *held*, that the boundary of certain land by a navigable lake, was not such a natural barrier as was contemplated by the statutes.

Appeal from Crittenden Chancery Court; *Charles D. Frierson,* Chancellor; affirmed.

*Brown & Anderson,* for appellants.

1.   Horse Shoe Lake is an unnavigable body of water, and plaintiffs' title extended to the middle of the lake, as abutting owners.  82 Ark. 367; 88 *Id.* 37; 92 *Id.* 39; 104 *Id.* 154; 36 Barb. 102; 95 N. C. 331; 59 Am. Rep. 242; 39 Ark. 409.  Navigability is a question of fact; if a stream or lake is navigable, then abutting owners of land only take title to the ordinary high water mark, but if unnavigable, then to the middle of the stream or lake.  67

Fed. 287; 148 *Id.* 781. The action of Government sur-
veyors in meandering a body of water is to be considered
as evidence, but is not conclusive. 175 U. S. 300; 52 Minn.
181; 18 L. R. A. 670; 127 Tenn. 601-661. The criterion is
whether or not a stream is useful to the population as a
means of transporting the products of field, forest or mer-
chandise.

2. Injunction will lie to prevent trespasses where
the relief is necessary to prevent multiplicity of suits, or
irreparable injury. 33 Ark. 633; 67 *Id.* 413; 93 *Id.* 93. The
right is certain and clear. 73 Ark. 236; 6 Can. Sp. Ct. 52;
69 Mich. 488; 36 Oh. St. 423; 33 L. R. A. 569; 148 Fed.
791; 49 N. C. 332; 53 Atl. 612; 43 Ill. 447; 8 L. R. A. 578;
19 Atl. 351; 22 Cyc. 746.

3. The submergence of the lands is entirely due to
the levee, and such artificial flooding does not have the
effect of ousting plaintiffs from either the possession or
title thereto. 97 C. C. A. 214; 78 N. E. 42; 6 L. R. A. (N.
S.) 136; 59 Ill. App. 51; 38 L. R. A. 855; 73 Ark. 236. The
high banks in connection with the fences and enclosures
constituted enclosed lands. 89 S. W. 1004; 76 Ark. 529.

*A. B. Shafer* and *E. L. Westbrook,* for appellees; *Mc-
Gehee, Levingston & Farabough,* of counsel.

1. Horse Shoe Lake is navigable in the American
sense. The question of navigability is one of fact. 39 Ark.
408. His finding will not be disturbed. 67 Ark. 200; 101
*Id.* 503; *Ib.* 522; 97 *Id.* 568; 148 Fed. 781. The test is, can
the stream be, or is it used for the purpose of commerce
for boats, rafts, vessels or logs, etc.? 90 Fed. 680; 59 Am.
Dec. 209; 50 *Id.* 641; 91 *Id.* 58; 73 *Id.* 439; 84 Pac. 395; 38
Am. St. 551; 11 Am. Rep. 380; 39 Ark. 409.

2. Where the level of a navigable lake is maintained
by artificial means, the rights of the public are corre-
spondingly extended. Should appellants attempt to in-
close such submerged lands, with a fence, any citizen
could enjoin them. 103 Wisc. 271; 70 N. W. 1115; 78 *Id.*
185; 56 Wisc. 73. Submerged lands belong to the State in
trust for the public use. 93 Wisc. 534; 33 L. R. A. 645;
100 Wisc. 86; 54 L. R. A. 790; 52 N. E. 1052; 101 Wisc.

479; 74 N. W. 185. None of these lakes are private ponds. Appellants have but a qualified right to hunt and fish on the lands or waters. 73 Ark. 236; Kirby's Digest, § 3598; 93 Ark. 92. The injunction was properly denied. 4 Eq. Jur. (Pomeroy), § 1338.

HART, J. A. S. Barboro and others, as trustees for the Five Lakes Outing Club, a voluntary, unincorporated association, instituted this action in the chancery court against Thos. R. Boyle and others for the purpose of restraining them from hunting and fishing upon lands alleged to belong to plaintiffs.

The plaintiffs held legal title to certain lands in the peninsula formed by Horse Shoe Lake in Crittenden County, Arkansas. Horse Shoe Lake, as its name implies, is a horse shoe shaped body of water, and was likely at one time a part of the bed of the Mississippi River. It is seven miles long and has an average depth of eighteen feet. It was connected with the Mississippi River by Buck Bayou, and in 1905, the St. Francis Levee District constructed its levee across Buck Bayou, and this had the effect of damming up the water in Horse Shoe Lake about five feet above its ordinary level.

In 1910, the plaintiffs installed a siphon to pump the water on the outside of the levee in such quantities as to reduce the bed of the lake to its ordinary level. After the siphon had been installed a few years, it was allowed to get out of repair and has not been used since.

It is the contention of counsel for the plaintiffs that Horse Shoe Lake is a meandered, nonnavigable body of water, and evidence was introduced by them tending to establish this fact.

On the other hand, it is the contention of the defendants that Horse Shoe Lake is a navigable body of water, and evidence was introduced by them to establish this contention.

The evidence on the question of the navigability of the lake will be considered later.

The chancellor held that Horse Shoe Lake is a navigable stream, but granted to the plaintiffs an injunction

restraining the defendants from hunting or fishing within certain limits which are stated in the decree, and which will be more particularly referred to later on.

The plaintiffs have appealed.

(1) The riparian owner upon a navigable stream, deriving title from the United States, takes only to high water mark, the title to the bed of the stream being in the State. *St. Louis, I. M. & S. Ry. Co.* v. *Ramsey,* 53 Ark. 314.

The riparian owner upon a nonnavigable stream is entitled to the center of it, ratably with the other riparian proprietors, the extent of his interest depending upon his frontage upon the lake. *Rhodes* v. *Cissel,* 82 Ark. 367; *Little* v. *Williams,* 88 Ark. 37; *Glasscock* v. *National Box Co.,* 104 Ark. 154.

The question of the navigability of Horse Shoe Lake was one of fact, and as tending to show that it was navigable, defendants introduced witnesses whose evidence tended to establish the following facts:

Horse Shoe Lake is situated in the southeast part of Crittenden County, and was probably once a part of the bed of the Mississippi River; the average width of the body of water is about a half mile, and the average depth about eighteen feet; beginning at the southeast end of the lake, there is about ten feet of water which runs out to shallow water about eighteen inches deep; further north, the lake widens out and becomes about two thousand feet wide, and the water from twenty-five to thirty feet deep; the lake is about seven miles long, and is deep enough and wide enough to float the largest steamers that ply the Mississippi River; the outside rim of the lake is a bluff bank and boats could be landed almost anywhere along it; the inside bank of the lake is sloping; there are a number of skiffs and gasoline boats on the lake used by the riparian owners; the lake is free from snags, and there is nothing to interfere with the navigation of large steamboats; the water is clear and the lake is full of all kinds of game fish; in the fall, ducks come there in vast numbers, and remain in that vicinity during the winter and at irregular inter-

vals the ripairan owners have used the lake for the pur-
pose of carrying by boat, freight from one point on the
lake to another.

The plaintiffs own a large body of land within the
peninsula and it abuts the inner banks of the lake. The
defendants also own land which abuts upon the lake.

The testimony on the part of plaintiffs tends to show
that Horse Shoe Lake has never been used regularly for
the purpose of commercial navigation, and that timber
and products of the soil have been transported on the
body of the lake only at irregular intervals, and never for
any continuous series of years; that the soil adjacent to
the lake is somewhat marshy, and is not adapted to the
building of roads; and that it would be difficult to build
roads leading from the lake to any populous center.

In the case of *Donnelly* v. *United States,* 228 U. S.
243, 30 Am. & Eng. Ann. Cas., 710, the court held that
what should be deemed navigable water within the mean-
ing of the local rules of property in the bed of a stream,
is for the determination of the several States.

In the case of the *Little Rock, Mississippi River &
Texas Rd. Co.* v. *Brooks et al.,* 39 Ark. 403, the court said:

"By the American doctrine, tide water, as a criterion
of navigable character, has been discarded. Nor is it any
objection to the public easement for navigation, that ri-
parian proprietors of lands, along fresh waters, own to
the thread of the stream. Nor is it necessary that the
stream should be capable of floating boats or rafts the
whole, or even the greater part of the year. Upon the
other hand, it is not sufficient to impress navigable
character, that there may be extraordinary times of tran-
sient freshets, when boats might be floated out. For, if
this were so, almost all insignificant streams would be
navigable. The true criterion is the dictate of sound busi-
ness common sense, and depends on the usefulness of the
stream to the population of its banks, as a means of car-
rying off the products of their fields and forests, or bring-
ing to them articles of merchandise. If, in its natural
state, without artificial improvements, it may be pru-

dently relied upon and used for that purpose at some seasons of the year, recurring with tolerable regularity, then, in the American sense, it is navigable, although the annual time may not be very long. Products may be ready and boats prepared, and it may thus become a very great convenience and materially promote the comfort, and advance the prosperity of the community. But it is evident that sudden freshets at uncertain times can not be made available for such purposes. No prudent man could afford the expense of preparation for such events, or could trust to such uncertainty in getting to market. The result of the authorities is this, that usefulness for purposes of transportation, for rafts, boats, or barges, gives navigable character, reference being had to its natural state, rather than to its average depth the year round.''

The chief contention of counsel for the plaintiffs is that the waters of the lake are not adapted to the purpose of navigation, and that they can never be used for that purpose, successfully, as a financial venture. We do not regard that as an exclusive test of the navigability of the lake.

(2)  It is true the testimony shows that Horse Shoe Lake has never been employed for the purpose of commercial navigation except at irregular intervals. But the testimony of the defendants shows that it is susceptible of that use. The fact that the lake has never been employed for the purpose of transporting the products of the farmers along its banks is no evidence that it may not be so used in the future. It is the policy of this State to encourage the use of its water courses for any useful or beneficial purpose. There may be other public uses than the carrying on of commerce of pecuniary value. The culture of rice is being developed in this State, and the waters of the lake could be used for the purpose of flooding the rice fields and for other agricultural purposes. As the population of the State increases, the banks of the lake may become more thickly populated, and the water could be used for domestic purposes. Pleasure resorts might even be built upon the banks of the lake and the water might be

needed for municipal purposes. Moreover, the waters of
the lake might be used to a much greater extent—for boat-
ing for pleasure, for bathing, fishing and hunting, than
they are now used. *Lamprey* v. *State,* 52 Minn. 181, 18
L. R. A. 670.

As said in the opinion in the case just cited, "to hand
over all these lakes to private ownership, under any old or
narrow test of navigability, would be a great wrong upon
the public for all time, the extent of which can not, per-
haps, be now even anticipated."

Therefore, we are of the opinion that Horse Shoe
Lake is navigable within the meaning and spirit of our
former decisions. The chancellor granted an injunction
in favor of the plaintiffs, and decreed that the defendants
should not hunt or fish within certain defined limits, and
it is contended by counsel for the plaintiffs that the court
erred in defining those limits.

From the southwest corner of Horse Shoe Lake Buck
Bayou extends into the Mississippi River. When the St.
Francis Levee District built its levee across Buck Bayou
in 1905, it caused the waters of Horse Shoe Lake to be
raised about five feet, and the plaintiffs' lands being on
the side of the lake where the bank sloped, this resulted
in the flooding of some of their property. In 1910 they in-
stalled a siphon for the purpose of drawing up the water
within the lake and emptying it on the outside of the levee,
and in this way reducing the waters of the lake to their
former level. In about two years the siphon became
choked up, and was not used any further.

(3)  It may be said that the St. Francis Levee Dis-
trict was given the power to construct a levee, and, by the
exercise of the right of eminent domain, to take whatever
lands were necessary for that purpose. They did not ac-
quire the lands of plaintiffs either by purchase or by the
exercise of the right of eminent domain, and therefore
plaintiffs had the right to pump the water out of the lake
so that the waters might be restored to their former level,
and thus prevent the flooding of their lands. When this
right is conceded to plaintiffs, it is contended by their

counsel that the chancery court erred in defining the limits of their lands upon which the defendants might hunt and fish. But we need not consider this question for the reason that we are of the opinion that the chancellor should not have issued any injunction.

In the early settlement of this State, there was much waste and forest land, and an abundance of all kinds of game on them. It was never considered that a person hunting upon the uninclosed lands of another was a trespasser. See *Bizzell* v. *Booker,* 16 Ark. 308.

(4) By section 1913 of Kirby's Digest, which was enacted January 21, 1875, persons were prohibited from ranging or hunting on the enclosed land of another without the consent of the owner previously obtained, and such acts constitute a trespass. A like section is contained in the game law passed at the recent session of the Legislature, and approved March 11, 1915. Thus it will be seen that a person has the exclusive right to hunt and fish upon his enclosed land and private grounds, and that he should be entitled to equitable relief to prevent interference with that right.

If it should be urged that injunctive relief should not be granted in such cases because a civil action for trespass would lie against the defendants, and that the offending parties might be prosecuted criminally under the statute above referred to, it may be said that such action upon the part of the land owner would require a multiplicity of suits and would afford no adequate relief.

Our statute makes it unlawful to express or carry beyond the limits of the State any game fish or game of any description, and the statute has been held to be a valid one. *Fritz* v. *State,* 88 Ark. 571.

The record shows that the plaintiffs have expended much money upon their property, and that the right to hunt and fish on it is highly prized by them. As we have already seen, they have the exclusive right to hunt and fish on their own lands when they are enclosed. To hold that such rights are not of sufficient importance for the court to protect them by injunction, would be to deprive property owners of substantial rights, and to encourage

wrong-doers in trespassing on their lands, for there could be no substantial recovery in a civil action for trespass.

Counsel for plaintiffs contend that the lands are enclosed, and that for that reason they are entitled to injunctive relief. The record shows that the lands border upon the side of the bank of the lake which slopes, and that a fence was built around that part of the land which did not border upon the lake, but that the greater part of their land did border upon the lake.

(5) Whether or not a natural barrier may be of such a character as to serve as part of an enclosure depends upon the peculiar facts of each case. See *Dowdle* v. *Wheeler,* 76 Ark. 529.

Whether or not they are in any given case is a question of fact. In determining that question, the quality, locality, character and condition of the land sought to be appropriated or set apart from the adjoining land for the exclusive use of the parties who erected the barrier, should be considered. The size of the tract, its condition and appropriate use, with the surrounding circumstances, should be considered in determining whether the natural barriers, taken in connection with the artificial barriers are sufficient to notify the public that the land has been appropriated, and to impart to the claim of appropriation the indication of ownership which is necessary.

The banks of the lake on the outer rim are steep, but the inside banks next to the land of the plaintiffs are sloping. The land rises gradually, and it is difficult to tell where the high water mark is on that side of the lake. As we have already seen, the title to the bed of the lake to high water mark is in the State for the use of the public, and the public have a right to hunt and fish therein. There is nothing on the bank adjacent to plaintiff's land to indicate where the high water mark is; and, under these circumstances, we do not think the bank of the lake is sufficient indication of the ownership of the plaintiffs, taken in connection with the artificial barriers, to constitute an enclosure.

For the reason that the public has a right to hunt on the unenclosed lands of another, the chancellor should not

have granted any injunction. But the defendants have not taken an appeal in this case, and the injunction granted by the chancellor must stand.

It follows that the decree will be affirmed.