LUTESVILLE SAND & GRAVEL COMPANY *v.* McLAUGHLIN.

Opinion delivered April 14, 1930.

*J. H. Townsend* and *C. D. Frierson,* for appellants.

*Eugene Sloan, L. B. Poindexter* and *David L. King,* for appellee.

SMITH, J. Margretta McLaughlin and her husband, T. F. McLaughlin, brought this suit against the appellant Gravel Company to recover the value of certain gravel alleged to have been taken from land owned by Mrs. McLaughlin, and judgment was rendered in her favor for the sum sued for.

The controlling question in the case is the one of fact whether Spring River, from which the gravel was removed, is a navigable stream. Mrs. McLaughlin amended her complaint to allege that the bar from which the gravel was removed was an accretion to her land, but the court held—and properly, we think—that under the undisputed testimony the bar was not an accretion to her land, and no complaint is made of that ruling.

Mrs. McLaughlin has title to a tract of land which is described in her deed and in the deeds to her predecessors in title as "All that part lying on the left or east bank of Spring River of east half of the northeast quarter of section 9, township 17 north, range 1 west." Therefore, if Spring River is a navigable stream, Mrs. McLaughlin takes only to the high water mark, whereas if the stream is not navigable, she has the right of a riparian owner to have her boundary extended in accordance with a rule well defined. The rule is as follows:

The riparian owner upon a navigable stream, deriving title from the United States, takes only to the high water mark, the title to the bed of the stream being in the State; but the riparian owner upon a non-navig-

able stream is entitled to the center of it, ratably with the other riparian proprietors, the extent of the interest depending upon the frontage upon the stream. *Barboro* v. *Boyle,* 119 Ark. 377, 178 S. W. 378; *St. L. I. M. & Sou. Ry. Co.* v. *Ramsey,* 53 Ark. 314, 13 S. W. 931, 8 L. R. A. 359, 22 Am. St. Rep. 195; *Rhodes* v. *Cissel,* 82 Ark. 367, 101 S. W. 758; *Little* v. *Williams,* 88 Ark. 37, 113 S. W. 340; *Glasscock* v. *National Box Co.,* 104 Ark. 154, 148 S. W. 248.

It is conceded that under the rule for the apportionment of the beds of non-navigable waters Mrs. McLaughlin owns the bar from which the gravel was removed if Spring River is non-navigable.

Opposing counsel have cited and reviewed many cases upon this subject, but, as the law has long been at rest in this State, we will not review or discuss any cases from any other jurisdiction.

The case of *Little Rock, M. R. & T. R. R. Co.* v. *Brooks,* 39 Ark. 403, announced the test of navigability, and that case has been consistently followed. The question there involved was that of the navigability of Bayou Bartholomew, and the court there held that the burden of proving navigability, when that fact was in dispute, was upon the party asserting that fact. It was there said: "By the American doctrine, tide water, as a criterion of navigable character, has been discarded. Nor is it any objection to the public easement for navigation, that riparian proprietors of lands, along fresh waters, own to the thread of the stream. Nor is it necessary that the stream should be capable of floating boats or rafts the whole, or even the greater part of the year. Upon the other hand, it is not sufficient to impress navigable character that there may be extraordinary times of transient freshets, when boats might be floated out. For, if this were so, almost all insignificant streams would be navigable. The true criterion is the dictate of sound business common sense, and depends on the usefulness of the stream to the population of its banks, as a means

of carrying off the products of their fields and forests, or bringing to them articles of merchandise. If, in its natural state, without artificial improvements, it may be prudently relied upon and used for that purpose at some seasons of the year, recurring with tolerable regularity, then, in the American sense, it is navigable, although the annual time may not be very long. Products may be ready and boats prepared, and it may thus become a very great convenience and materially promote the comfort and advance the prosperity of the community. But it is evident that sudden freshets at uncertain times cannot be made available for such purposes. No prudent man could afford the expense of preparation for such events, or could trust to such uncertainty in getting to market. The result of the authorities is this, that usefulness for purposes of transportation, for rafts, boats or barges, gives navigable character, reference being had to its natural state, rather than to its average depth the year round (citing authorities)."

This statement of the law was quoted and approved in *Barboro* v. *Boyle, supra.*

The defendant admitted in its answer the removal of the gravel from the bar in question, but in paragraphs numbered 11, 12, 13 and 16 of its answer alleged certain facts by way of defense, which, on motion of the plaintiff, were stricken from the answer.

In paragraph 11 it was alleged that prior to the installation of defendant's plant for removing the gravel the War Department of the United States announced its decision that Spring River at the point in question was a navigable stream, and that the Department was exercising jurisdiction over it as such, and that a permit would be required before an overhead cableway across the river could be erected, and that this permit was obtained from the War Department, a copy of which was made an exhibit to the answer.

Paragraph 12 alleged that the point in controversy on Spring River is only two miles from Black River,

into which Spring River empties, and is only about a mile below the mouth of Eleven Points River, which is itself a navigable stream emptying into Spring River. That Black River connects with the White River, which empties into the Mississippi River, which, in turn, empties into the Gulf of Mexico, and that these streams, together, make a navigable waterway and channel for commerce, both interstate and foreign, and are therefore within the exclusive jurisdiction of the War Department of the United States.

In paragraph 13 it was alleged that two bridges across Spring River had been erected at points higher up the stream, and that the War Department had required that permission to erect them be first obtained, and that this permission had been obtained through special Acts of the Congress of the United States, copies of which were made exhibits to the answer.

Paragraph 16 denied that any sand or gravel had been removed from the banks of Spring River, but alleged that the sand and gravel had been taken from bars within the meandered lines and within the permanent bed of the river.

We think the court erred in striking out these paragraphs, and that the matters there alleged were and are evidentiary facts, to be considered in passing upon the ultimate question to be decided—that is, the navigability, in fact, of Spring River at the point where the gravel was removed.

In the case of *Little Rock, M. R. & T. R. R. Co.* v. *Brooks, supra,* it was insisted that the plaintiff, who there asserted the navigability of Bayou Bartholomew, "had failed to show *by any legal proof* that the bayou is a navigable stream by law," but the court said: "Parol proof was admissible. It is not necessary that the bayou should have been declared navigable by any statute of the State or Federal governments."

The authorities are also to the effect that, while the action of the War Department in assuming jurisdiction

over a stream as being navigable, and that of the Congress in passing legislation granting permits to build bridges, are not conclusive of the question of navigability where there is no express declaration of that fact, yet such action should be assigned weight in view of the power of legislative inquiry and judgment, although their effect is not to declare a river navigable in its natural state when the Acts of Congress do not purport to do so. *United States* v. *Brewer-Elliott Oil & Gas Co.,* 249 Fed. 609; *United States* v. *Cress,* 243 U. S. 316, 37 S. Ct. 380.

At § 14 of the chapter on Navigable Waters, 45 C. J. 416, it is said: "While the attitude of the Federal government, not amounting to a definite declaration, is to be considered upon the question of navigability, as is also the attitude of a State, navigability is not established by the fact that Congress has granted authority to construct a bridge in accordance with the general statute governing the bridging of navigable waters, nor by a precautionary proviso in such grant or permission that there shall be no interference with navigation, nor by congressional appropriations for the improvement of a river."

Here we have the action of the War Department in requiring and granting permission to extend cables across the river upon the theory that jurisdiction had been assumed over it as a navigable stream. We have also two special acts of Congress granting permission to build bridges across the stream at points above the gravel bar in question.

There was also offered in evidence an application made to the Commissioner of Insurance and Revenues of the State of Arkansas pursuant to the laws of this State (§ 6789 C. & M. Digest and Act 88 Acts of 1925, page 260) to remove the gravel. The permission required by the laws of this State to remove gravel from navigable streams was granted October 14, 1927, by the Commissioner of Insurance and Revenues of the State

for the agreed prices of two and one-half cents per cubic yard for sand and five cents per cubic yard for gravel, but upon the condition that the applicant "will not use this permit for the purpose of taking sand or gravel from said streams at any point where the same is not navigable, and * * * will not remove any sand or gravel from above mean high water mark."

There was also offered in evidence the official plat of the government survey of this stream, with the field notes of the survey, which show that the stream had been meandered in such survey.

Upon the subject of meandering streams in government surveys the following statement of the law appears at § 15 of the chapter on Navigable Waters, 45 C. J. page 416: "The running of a meander line along the bank of a stream does not establish its navigability, although it has been held that a body of water which has been meandered is *prima facie* navigable, but is not necessarily or conclusively so. Similarly the fact that a stream has not been meandered and returned as navigable does not show that it is non-navigable, but raises that presumption."

Among other cases cited in the note to this text is that of *Harrison* v. *Fite,* 78 C. C. A. 447. This case involved the navigability of Big Lake and Little River in this State, and affirmed the decree of the circuit court of the United States for the Eastern District of Arkansas (148 Fed. 781) holding that those waters were not navigable. Much that was said in the opinion in that case is relevant here, and upon the question of meandered streams it was there said: "The action of the government surveyors in meandering a body of water or in surveying its bed is to be considered as evidence upon the question of its navigability or unnavigability at the time; but it is not conclusive. The surveyors are invested with no power to foreclose inquiry into the true character of the water. If the United States has disposed of lands bordering upon a meandered unnavigable water

course or lake, by a patent containing no reservations, and there is nothing else indicating an intention to withhold title to the lands within the meander lines (*Niles* v. *Cedar Point Club,* 175 U. S. 300, 20 Sup. Ct. 124, 44 L. Ed. 171) it has nothing left to convey; and whether the title to the bed of the waters is in the State or passes to the grantee in the patent is determined by the local law. (*Lamprey* v. *Minnesota,* 52 Minn. 181, 53 N. W. 1139, 18 L. R. A. 670, 38 Am. St. Rep. 541). * * * Courts take judicial notice of the navigable character of our important rivers and inland lakes—those that are so within our common knowledge; but there are many of such insignificant capacity and doubtful utility that the question, being one of fact, is to be determined by the evidence produced, and in such case the burden of proof rests upon him who asserts the existence of the public servitude.''

In addition to this evidence, all of which, except the permit from the State, was apparently treated by the trial court as being without evidentiary value, but which, as we have shown, does have evidentiary value, the following testimony was offered. W. E. Verkler testified that he was a boatman and timberman, with an experience of forty years on Spring River, and that he had license from the Federal government to operate boats on Spring River. Of this witness appellee says: ''No one attempted to impeach his testimony or to question his sincerity.'' This witness testified that at different times he had operated on Spring River the Blue Goose, Ruby Pearl, the Quick Step, and the Boll Weevil, all of which were stern wheel steamboats, and that these boats had towed barges four feet deep, thirty feet wide, and sixty feet long, and upon these barges carried anything he pleased. That he made a number of trips up Spring River to defendant's plant, and delivered there railroad steel which was used in the construction of the plant, and that he had towed in barges to points higher up the stream material used in the construction of the

two bridges authorized by Acts of Congress which have been referred to. He also testified that when the toll bridges was built at Powhatan on Black River he brought out from Spring River on barges twenty feet wide and sixty-six feet long the gravel used in the construction of that bridge. He also testified that he had had a large number of logs, of all sizes, rafted down Eleven Points River to Spring River, and down Spring River to Black River, and that some of these logs would draw as much as forty-six inches of water, that is, the logs would sink that deep in the water in floating, and he further testified that if a few snags were taken out and some work done on the shallow places or "riffles" as he called them, boats could go up and down Spring River at any time of the year, and that you can go up and down the river with light craft now at any time.

Other testimony corroborative of this was offered, but after hearing six witnesses on the subject the court announced that only that number would be permitted to testify on either side.

The defendant offered—but the court excluded—testimony to the effect that other boats, the names of which were stated, had run to points higher up the stream carrying and delivering various articles of commerce.

There was offered in evidence photographs taken March 20, 1929, which showed the river at defendant's plant to be about five hundred feet wide, and soundings made on that day showed its depth to be ten feet in the shallowest water, and when the pictures were made the Boll Weevil, a steamer, a deck and a half high, was pushing a large barge. The pictures show the river to be well within its banks. It was admitted by the plaintiff and the witnesses who testified in her behalf that the river was in fact navigable, even for steamboats, at certain seasons of the year, but their testimony was to the effect that this navigable condition was intermittent and irregular, and did not exist except after rains, and did not occur at fixed periods of time or continue for any definite

duration, and that in low water the river was not navigable for rafts; that there were bars in the river over which the rafts could not be floated, and that the rafts would have to be broken up and the logs floated over, one at a time, and in some instances the logs had to be rolled over in the shallow water. Plaintiff also offered testimony to the effect that there were certain fords which could be crossed in low water, and that on one occasion an automobile had been driven over one of these fords, and one witness testified that he had on several occasions driven a reaper across the river at one of these fords. It was not contended, however, that this could be done or had been done except at low stages of the river, and, even then, only at the fords, but the testimony shows that even at those places and at the lowest stages of the river boats of light draft called ''John Boats'' could be propelled.

We have concluded that the undisputed testimony is to the effect that Spring River is a navigable stream under the tests of navigability laid down in the previous decisions of this court hereinabove referred to. Except at the shallows or bars there is, at all seasons of the year, enough water to carry rafts and similar commerce, and except during the periods of low water the river has a sufficient depth to accommodate substantial commerce, and, while this period of time varies somewhat, it does continue for a period of several months every year, and may be reasonably anticipated to exist except in the summer and fall when the river is at a low stage.

We conclude, therefore, that the court should have held, under the undisputed testimony, that Spring River is a navigable stream, and, being such, that the plaintiff had no cause of action to recover the value of the gravel taken from the stream opposite her land, and a verdict should, therefore, have been directed in defendant's favor, and for the error in not so doing the judgment is reversed, and the cause will be dismissed.

HUMPHREYS, J., disqualified and not participating.