**In re RIVER QUEEN,**
**Serial No. H 64106.**
**No. 607.**

United States District Court
W. D. Arkansas,
Fayetteville Division.

Nov. 6, 1967.

Owen C. Pearce, Fort Smith, Ark., for petitioner.

Crouch, Blair & Cypert, Springdale, Ark., E. J. Ball and James W. Gallman, Fayetteville, Ark., for respondent.

## OPINION

JOHN E. MILLER, Senior District Judge.

On May 8, 1967, Luther George and wife, Helen George, filed their petition in due form for limitation of liability as provided by Rule F, Supplemental Rules for Certain Admiralty and Maritime Claims, effective July 1, 1966, 46 U.S.C.A. §§ 181–195.

In the petition it was alleged that:

"I.

"Petitioners would show that on or about March 26, 1967, they owned a 1966 River Queen thirty-eight (38) foot boat with Serial No. H 64106. This boat was docked and moored at the Hickory Creek Boat Dock, on Beaver Lake near Springdale, Arkansas. This is a navigable body of water under the jurisdiction of the U. S. Army Corps of Engineers. The River Queen 38 foot boat Serial No. H 64106 was a vessel used on lakes or rivers or in inland navigation in compliance with Section 188 of Title 46 of the U. S. Code, 46 USCA.

"II.

"On or about March 26, 1967, while the said 38 foot River Queen Serial No. H 64106 was tied and moored to the dock, without the privity or knowledge of the owners, Luther George and Helen George, while said Luther George and Helen George were not present and had entrusted the boat to agents, servants and employees of Beavark, Inc., owner of the dock and shelter, there occurred a fire on board said River Queen boat Serial No. H 64106 which damaged the said River Queen 38 foot boat Serial No. H 64106 and vessels and property of the following individuals and companies:

"Beavark, Inc., owner of the dock and shelter;

Dr. Lawrence Seigel, owner of a 1950 Crisscross 32 foot cruiser;

Jay Smith, owner of a 1963 Crisscraft 32 foot cabin cruiser;

James Cypert, owner of a 1963 Kayot houseboat;

Shelby Ford, owner of a 1964 Wigwam housetrailer on a barge;

Any and all other now unknown and unidentified claimants of damage resultant from the above described occurrence."

Only Beavark, Inc., and James D. Cypert filed answers or responses to the motion.

A receiver was appointed to take charge of the boat.

The owners, Mr. and Mrs. George, carried fire insurance on their boat, and within a few days after it was burned, their insurance company paid the petitioners $10,000, the face amount of the policy, and took charge of the boat in its damaged condition. Mr. George repurchased the boat from the insurance company for $510.00, and petitioners filed an amendment to their petition and asked that the receiver be discharged and deposited the sum of $510.00 in the registry of the court. Thereupon, the court discharged the receiver.

In the separate answers of Beavark, Inc., and James D. Cypert, each admitted that the boat owned by the petitioners was moored at the Hickory Creek Boat Dock as alleged by petitioners; denied "that Beaver Lake is navigable water of the United States within the meaning of the admiralty law, but admits that the lake itself, including the bottom and shoreline, to mean water mark as well as the flowage easements to high water mark are the property of the United States, under control and administered by the U. S. Army Corps of Engineers; denies that said boat was a vessel used on lakes or water or in inland navigation or in maritime commerce in compliance with Section 188 of Title 46, United States Code, for the reason that ad-

miralty law and the aforementioned Section in particular does not apply to Beaver Lake as a navigable water of the United States or to the said River Queen as a vessel included within said section."

The respondent Beavark, Inc., asserted a claim in the amount of $3,739.80 for damage to its property by reason of the fire aboard petitioners' boat. The respondent James D. Cypert asserted a claim for $2,500.00, representing the difference between the market value of his boat immediately before and after the fire.

The case was tried to the court on October 18, 1967. At the beginning of the trial the court stated that in its opinion the following questions were presented by the pleadings:

1. Does the court have jurisdiction of the subject matter?

2. If it is found that the court has jurisdiction, then it must determine whether the fire occurred without the privity or knowledge of the petitioners.

3. If the court finds that it has jurisdiction and that the fire occurred without the privity or knowledge of the owners, then the court should determine the amount of the damage suffered by the respondents.

4. If the court should find that it has jurisdiction of the parties and the subject matter, but that the fire occurred with the privity or knowledge of the owners, then it should proceed to ascertain the amount due each of the respondents after crediting the sum on deposit in the registry of the court pro rata to the claims of the respondents.

The first question for determination is whether the court has jurisdiction of the subject matter.

Section 2 of Article 3 of the Constitution of the United States provides:

"The judicial Power shall extend * * * to all Cases of admiralty and maritime Jurisdiction * * *."

In accordance with the constitutional provision, the Congress enacted 28 U.S.C. § 1333, which provides:

"The district courts shall have original jurisdiction, exclusive of the courts of the States, of:

"(1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled."

In 1 Benedict on Admiralty, 6th Ed., page 2, the learned author states:

"Admiralty jurisdiction, in contract cases, is dependent upon the maritime nature of the contract, and, in tort, upon the maritime locality of substance and consummation of the wrong, i. e., it must have taken place upon the high seas *or other public navigable waters of the United States.*" (Emphasis added.)

In 1866, the Supreme Court of the United States, in the case of Hough v. Western Transportation Company (The Plymouth), 3 Wall. 20–37, 70 U.S. 20, 18 L.Ed. 125, at page 127, in discussing jurisdiction, said:

"It is admitted by all the authorities, that the jurisdiction of the admiralty over maritime torts depends upon locality—the high seas, or other navigable waters within admiralty cognizance; and being so dependent upon locality, the jurisdiction is limited to the sea or navigable waters not extending beyond high water mark."

In Hess v. United States, (9 Cir. 1958) 259 F.2d 285 (reversed on nonjurisdictional grounds, 361 U.S. 314, 80 S.Ct. 341, 4 L.Ed.2d 305), the court held that admiralty jurisdiction depends upon whether injury for which recovery is sought was inflicted upon navigable waters irrespective of where the wrongful act or omission occurred.

In 2 Am.Jur.2d, Admiralty, § 22, p. 733, the learned authors state:

"An important element in determining whether the subject of litigation is within admiralty jurisdiction is whether it relates to something that

occurred on water rather than on land. The jurisdiction of the admiralty courts of the United States extends to all waters that are in fact navigable, regardless of whether they are influenced by the tide, are landlocked or open, or are salt or fresh. Waters are navigable when they are, in their ordinary condition used or susceptible of use as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. Accordingly, in addition to causes arising out of navigation of the high seas, bays, inlets, harbors, and tidewaters, there may be included within admiralty jurisdiction causes arising out of the navigation of lakes and rivers whereon commerce moves between states or to or from foreign countries."

■ There are a great many decisions dealing with the question of navigability of streams and lakes. When the question arises, the facts must be considered and the applicable law applied to the facts in the particular case to determine whether the injury was committed upon navigable waters.

In United States v. Appalachian Electric Power Co., (1940) 311 U.S. 377, 61 S.Ct. 291, at page 297, 85 L.Ed. 243, the court said:

"The legal concept of navigability embraces both public and private interests. It is not to be determined by a formula which fits every type of stream under all circumstances and at all times. Our past decisions have taken due account of the changes and complexities in the circumstances of a river. We do not purport now to lay down any single definitive test."

In 56 Am.Jur., Waters, § 179, at page 645, it is stated:

"Navigability, in the sense of actual usability for navigation or navigability in fact, as a legal concept embracing both public and private interests, is not susceptible of definition or determination by a precise formula which fits every type of stream or body of water under all circumstances and at all times. A general definition or test which has frequently been approved is that rivers or other bodies of water are navigable when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. Another test is whether, in its ordinary state, a stream or body of water has capacity and suitability for the usual purpose of navigation, ascending or descending, by vessels such as are employed in the ordinary purposes of commerce, whether foreign or inland, and whether steam or sail vessels."

In 1 Benedict on Admiralty, 6th Ed., § 44, p. 94, the learned author states:

" * * * The true criterion of navigability is capability of use by the public for purposes of transportation and commerce rather than the extent and manner of that use. Fitness for use by steam and sail vessels is not essential: it suffices that, for example, light-draft barges, propelled by animal power and avoiding falls by portages, carry a considerable tonnage. It is not enough that a fishing skiff or gunning canoe can be made to float at high water, that a skiff or small lugger can pass to connecting waters or that logs, poles or rafts are floated down in high water. Navigability need not be continuous through the year but must be as regular as the seasons and of a duration long enough to be useful and valuable in transportation. A court should take judicial notice that an important river is navigable and may consult authoritative works to enable it to do so; but when in doubt will require evidence."

In United States v. State of Utah, (1931) 283 U.S. 64, 51 S.Ct. 438, at page 441, 75 L.Ed. 844, Chief Justice Hughes quoted from United States v. Holt State

Bank, 270 U.S. 49, 56, 46 S.Ct. 197, 199, 70 L.Ed. 465, as follows:

" 'The rule long since approved by this court in applying the Constitution and laws of the United States is that streams or lakes which are navigable in fact must be regarded as navigable in law; that they are navigable in fact when they are used, or are susceptible of being used, in their natural and ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water; and further that navigability does not depend on the particular mode in which such use is or may be had—whether by steamboats, sailing vessels or flat-boats—nor on an absence of occasional difficulties in navigation, but on the fact, if it be a fact, that the stream in its natural and ordinary condition affords a channel for useful commerce.' "

█ In determining the capacity as bearing on the question of whether a stream should be considered as navigable, inquiry should be made as to the number of persons the stream would accommodate and the nature and extent of the kinds of vessels it would carry. The mere fact that the stream might at times carry single logs or canoes or the average row boat used by fishermen is not sufficient to establish the navigability of the stream. The stream must be navigable for some purpose useful to trade or commerce. It must serve a useful purpose in opening a commercial route for the people living along its banks. See 56 Am.Jur., Waters §§ 180, 181.

In Harrison v. Fite, (8 Cir. 1906) 148 F. 781, the question before the court was the navigability of Big Lake in northeastern Arkansas. The court, at page 783, said:

"The shores of navigable waters and the soils under them were not granted by the Constitution to the United States, but were reserved to the states respectively; and the new states upon their admission to the Union have the same rights in respect thereof as the original states. As to lands bounded on unnavigable waters the United States assumes the position of a private owner subject to the general law of the state so far as its conveyances are concerned. In either case the question whether the title to the soil under the waters passes to the grantee of the shore land is determined by the law of the state where the land lies. Hardin v. Shedd, 190 U.S. 508, 519, 23 S.Ct. 685, 47 L.Ed. 1156, and cases there referred to."

Beginning at the bottom of page 783, the court said:

"To meet the test of navigability as understood in the American law a water course should be susceptible of use for purposes of commerce or possess a capacity for valuable floatage in the transportation to market of the products of the country through which it runs. It should be of practical usefulness to the public as a public highway in its natural state and without the aid of artificial means. A theoretical or potential navigability, or one that is temporary, precarious, and unprofitable, is not sufficient. While the navigable quality of a water course need not be continuous, yet it should continue long enough to be useful and valuable in transportation; and the fluctuations should come regularly with the seasons, so that the period of navigability may be depended upon. Mere depth of water, without profitable utility, will not render a water course navigable in the legal sense, so as to subject it to public servitude, nor will the fact that it is sufficient for pleasure boating or to enable hunters or fishermen to float their skiffs or canoes. To be navigable a water course must have a useful capacity as a public highway of transportation. [Citing cases.]

\*    \*    \*    \*    \*    \*

"It does not follow that, because a stream or body of water was once navigable, it has since continued and remains so. Changes may occur especially in small and unimportant

waters, from natural causes, such as the gradual attrition of the banks and the filling up of the bed with deposits of the soil, the abandonment of use followed by the encroachment of vegetation, and the selection by the water of other and more natural and convenient channels of escape, that work a destruction of capacity and utility as a means of transportation; and, when this result may fairly be said to be permanent, a stream or lake in such condition should cease to be classed among those waters that are charged with a public use."

At page 785 the court said:

" * * * Courts take judicial note of the navigable character of our important rivers and inland lakes—those that are so within our common knowledge; but there are many of such insignificant capacity and doubtful utility that the question, being one of fact, is to be determined by the evidence produced, and in such case the burden of proof rests upon him who asserts the existence of the public servitude.

 *    *    *    *    *    *

" * * * Whatever may have once been the capacity and utility of the body of water known as 'Big Lake' as a highway of commerce or in the floatage of the products of the fields and forests along its banks, the conditions that are to be considered are those of recent years and the present."

In Gratz v. McKee, (8 Cir. 1920) 270 F. 713, 23 A.L.R. 1393, the court, with approval, quoted at length from Harrison v. Fite, supra.

In Parker, Commissioner of Revenues v. Moore, (1953) 222 Ark. 811, 262 S.W. 2d 891, the question before the court was whether Cut-Off Lake is navigable. The court unqualifiedly approved and followed Harrison v. Fite, supra.

■ The burden of proof rests upon the petitioners to establish the navigability of the portion of White River that is involved in this proceeding. In 56 Am. Jur., Waters, § 193, p. 656, it is stated:

"The question of the navigability of a nontidal stream or body of water is one of fact, as to which the burden of proof rests upon the party asserting such navigability, unless the court takes judicial notice of its status in this respect. Even where the navigability of a river, speaking generally, is a matter of common knowledge, and hence one of which judicial notice may be taken, it may yet be a question to be determined upon evidence of how far navigability extends."

■■ In Arkansas the riparian landowner on a navigable stream, having derived his title from the United States, takes only to the high-water mark of the stream, the title to the bed thereof being in the State. On a non-navigable stream, the riparian landowner holds title to the center of the stream. Lutesville Sand & Gravel Co. v. McLaughlin, (1930) 181 Ark. 574, 26 S.W.2d 892.

The United States acquired, by eminent domain proceedings, title to the land included in the reservoir created by the construction of Beaver Dam and Reservoir. There is no evidence in the record as to whether the Government surveyors meandered White River above the dam site. The first suit for the taking of the property under the power of eminent domain was filed August 20, 1959. A great many other proceedings were filed by which the fee simple title to 30,420 acres were acquired, and perpetual flowage easements were imposed on 8,230 acres. There were about 800 ownerships involved and approximately 13,000 tracts of land were acquired. The area acquired was largely devoted to dairying, poultry raising, the growing of berries, peaches and apples, and general livestock farming, together with production of timber. In all of the suits the Government acquired title to the middle of the stream. Had the river been considered navigable, the Government could have acquired title from the riparian owners only to the high-water mark, for the reason that title to the bed of the stream would have been in the State of

Arkansas. See paragraph one of the opinion in Harrison v. Fite, supra.

The action taken by the Government in acquiring title to the dam site and land situated within the reservoir may be considered as evidence upon the question of the navigability or non-navigability of the river at the time the dam and reservoir were constructed, although such evidence is not conclusive.

During the trial no evidence was introduced by any of the parties as to the length of the reservoir, but the court was authorized by the attorneys for the parties to make inquiry of the U. S. Corps of Engineers in charge of the work and obtain such information. The information was received by letter dated October 23, 1967, from William K. Finefield, Chief, Real Estate Division, a copy of which was furnished counsel, and reveals that the distance from the Arkansas-Missouri line to Beaver Dam is 17 river miles. The normal pool elevation in the reservoir is 1,120 feet, m.s.1. With the water level at that elevation, the distance from Beaver Dam to the end of high water in the reservoir is 74 river miles. The top of the flood control pool in the reservoir is at an elevation of 1,130 feet, m.s.1, and, predicated upon that elevation, the distance from the dam to the end of the high water in the reservoir is 77 river miles.

White River rises in the Ozark Mountains in northwest Arkansas, and contains three branches: West Fork, Middle Fork, and what is designated as the river itself. Immediately below where Middle Fork joins with the branch designated White River, the City of Fayetteville, Arkansas, has constructed Lake Sequoyah as a source of water for the City. West Fork enters the stream north of the Fayetteville waterworks dam. In the 79 river miles upstream from Beaver Dam, a great many wet-weather streams and small branches flow into the river.

Morgan Lauber, a laborer of Rogers, Arkansas, testified that prior to the erection of Beaver Dam, he was a fishing guide and guided fishermen in the cus-tomary 14- to 16-foot long flat-bottom row boat from the point of entry to the town of Beaver, which is situated about eight miles below the dam. Another witness, Homer Pack, had been subpoenaed but was unable to appear and testify. However, it was agreed that if he were present, he would testify that he also acted as a fishing guide, and guided such boats with himself and two fishermen aboard from a distance eight miles above the south end of the present reservoir to the Missouri line, and in some instances a few miles across the line into Missouri, or about 70 miles down the river. Joe Means, a lumberman and saw-mill operator, also testified that he was familiar with the river and that prior to the erection of the dam, he often fished on the river and floated most of the river that is now in the reservoir area. Those three witnesses were the only ones who testified relative to the navigability of the river.

The historical facts of that portion of White River above Beaver Dam and Reservoir do not support the contention that the river in its natural state was navigable. It never had the capacity and suitability for the usual purposes of navigation, either ascending or descending, by vessels such as are usually employed in the ordinary purposes of commerce. The evidence does not establish that the river was ever susceptible of being used in its natural and ordinary condition as a highway for commerce over which trade and travel were, or might be, conducted in the customary modes of trade and travel on water.

Since the construction of Beaver Dam and Reservoir and the creation of the lake, the only possible use of the lake is for fishing and other means of recreation. Many affluent citizens have purchased various kinds of pleasure craft for use on the lake. The extreme upper reaches of the river are still used occasionally by fishermen who prefer the usual method of floating in a canoe or light boat capable of passing over the shoals and other obstacles. There is no outlet to the lake, and the stream in its natural

and ordinary condition has never afforded a channel for useful commerce between states or to and from foreign countries.

■ The dam and reservoir are situated entirely within Arkansas, and the contention of the petitioners that the river in its original, natural, and ordinary condition, and the lake are a navigable body of water is, in the opinion of the court, entirely without merit.

Having reached such conclusion, the court lacks jurisdiction to determine the other issues raised by the pleadings. A decree in accordance with the above is being entered today dismissing the petition for limitation of liability.