The Honorable Wayne Dowd State Senator P.O. Box 2631 Texarkana, Arkansas 75502-2631
Dear Senator Dowd:
This official Attorney General opinion is issued in response to your recent inquiry relating to Crooked Creek. You indicate that a number of private individuals presently mine gravel out of Crooked Creek. You have presented the following questions:
 (1) Can Crooked Creek be considered a "navigable" body of water for purposes of federal law (i.e., the federal" Clean Water Act") and for purposes of state law?
 (2) If Crooked Creek is a "navigable" body of water under applicable state or federal law, what would be the effect upon the private individuals who currently mine gravel from Crooked Creek of conferring "extraordinary resource water" status upon Crooked Creek?
 (3) If the cessation of private gravel mining on Crooked Creek were to occur, would private citizens have any right of action against the State?
RESPONSE
Question 1 — Can Crooked Creek be considered a "navigable" body of waterfor purposes of federal law (i.e., the federal "Clean Water Act") and forpurposes of state law?
The question of whether any particular body of water is "navigable" under either federal or state law is an inherently factual question. LutesvilleSand Gravel Co. v. McLaughlin, 181 Ark. 574, 26 S.W.2d 892 (1930) (question of navigability under state law is factual). The office of the Attorney General is not empowered to operate as a factfinder. For this reason, I am unable to opine conclusively in response to your question. I can, however, set forth the applicable principles and guidelines that have been enunciated by the legislative and judicial branches of government with regard to the issue that you have raised.
"Navigability" Under the Federal "Clean Water Act"
The term "navigable waters" is defined by the federal "Clean Water Act" [formally entitled the "Federal Water Pollution Control Act," and codified at 33 U.S.C. § 1251 et seq.)] to mean: "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362 (7). In UnitedStates v. Riverside Bayview Homes, 474 U.S. 121 (1985), the U.S. Supreme Court recognized and applied the Corps of Engineers' construction of the Act's definition of "navigable waters." That construction is set forth in the regulations promulgated by the Corps of Engineers pursuant to the authority of the Act, and includes waters that are "navigable in fact, interstate waters and their tributaries, and nonnavigable intrastate waters whose use or misuse could affect interstate commerce. 40 Fed. Reg. 31320." Riverside Bayview Homes, 474 U.S. at 124.
Clearly, a determination of whether Crooked Creek falls within this definition of "navigable waters" for purposes of the federal Clean Water Act will require a fact-intensive inquiry into the physical characteristics of Crooked Creek, as well as its potential and actual uses and the potential and actual effects of such uses.
"Navigability" Under Arkansas State Law
"Navigability" for purposes of state law has been defined by the Arkansas Supreme Court. The definition has evolved over the years as cases concerning navigability have come before the court. That series of cases culminated with State v. McIlroy, 268 Ark. 227, 595 S.W.2d 659 (1980), in which the court enunciated the definition of "navigability" as it is currently constituted.
The McIlroy court derived a portion of its definition from the language of an earlier line of navigability cases, an example of which isLutesville Sand Gravel Co. v. McLaughlin, 181 Ark. 574, 26 S.W.2d 892
(1930). In that case, the court defined "navigability" as follows:
 "The true criterion [of navigability] is the dictate of sound business common sense, and depends on the usefulness of the stream to the population of its banks, as a means of carrying off the products of their fields and forests, or bringing to them articles of merchandise. If, in its natural state, without artificial improvements, it may be prudently relied upon and used for that purpose at some seasons of the year, recurring with tolerable regularity, then, in the American sense, it is navigable, although the annual time may not be very long. Products may be ready and boats prepared, and it may thus become a very great convenience and materially promote the comfort and advance the prosperity of the community. But it is evident that sudden freshets at uncertain times cannot be made available for such purposes. No prudent man could afford the expense of preparation for such events, or could trust to such uncertainty in getting to market. The result of the authorities is this, that usefulness for purposes of transportation, for rafts, boats or barges, gives navigable character, reference being had to its natural state, rather than to its average depth the year round."
Lutesville Sand Gravel, 181 Ark. at 576-77, quoting Little Rock,Mississippi River and Texas R.R. Co. v. Brooks, 39 Ark. 403, 409 (1882).
The McIlroy court summarized the above-quoted definition of "navigability" as follows: "[A] river is legally navigable if actually navigable and actually navigable if commercially valuable." McIlroy,268 Ark. at 235. The McIlroy court then went on to expand the criteria for "navigability" to include the suitability of the body of water in question for recreational purposes such as fishing in flat-bottomed boats, canoeing, and floating. McIlroy, 268 Ark. at 237.
The definition of "navigability," as set forth by the Arkansas Supreme Court in McIlroy, has not been altered since that case was decided.
Accordingly, it is clear that a determination of whether Crooked Creek is "navigable" for purposes of state law will require a factual inquiry into the elements outlined by the court in McIlroy, including the physical characteristics of Crooked Creek, its commercial value as a reliable means of transporting goods and merchandise, and its suitability for recreational purposes.
Question 2 — If Crooked Creek is a "navigable" body of water underapplicable state or federal law, what would be the effect upon the privateindividuals who currently mine gravel from Crooked Creek of conferring"extraordinary resource water" status upon Crooked Creek?
I must note initially that if Crooked Creek is a "navigable" body of water, it is unlawful for private individuals to mine gravel from Crooked Creek without a permit or lease. See A.C.A. § 22-5-805.
Regarding the designation of Crooked Creek as an "extraordinary resource water," it is my opinion that the effect of such a designation upon the private individuals who currently mine gravel from Crooked Creek will depend upon the factors which formed the basis for the designation, and upon the effect of the gravel mining on those factors.
A body of water can be designated for use as an "extraordinary resource water" on the basis of its demonstrating "a combination of the chemical, physical and biological characteristics of a waterbody and its watershed which is characterized by scenic beauty, aesthetics, scientific values, broad scope recreational potential and intangible social values." Arkansas Dept. of Pollution Control and Ecology Regulations, Regulation No. 2, Section 4(C).
The significance of the designation of a body of water as an "extraordinary resource water" is that "significant physical alteration" of that body of water is generally not allowed. See Arkansas Dept. of Pollution Control and Ecology Regulations, Regulation No. 2, Section 4(E). However, the regulations make provision for certain exceptions to this general prohibition against alteration, including an exception allowing for modification of the water quality criteria to accommodate economic or social development in a local area, if the designated use is maintained. See Arkansas Dept. of Pollution Control and Ecology Regulations, Regulation No. 2, Section 4(B), (E), and (G). Approval of any "significant physical alteration" to any "extraordinary resource water" under one of the provided exceptions must be obtained from the Department of Pollution Control and Ecology.
On the basis of these regulations, I must conclude that if Crooked Creek is designated as an "extraordinary resource water," the question of whether that designation will impact upon the private individuals who are currently mining gravel from Crooked Creek will depend, in the first instance, upon whether such mining is deemed to constitute a "significant physical alteration." This is a question of fact that can only be determined on the basis of specific evidence reflecting the physical impact (or lack thereof) on Crooked Creek that is brought about by the mining.
If the mining is determined to constitute a significant physical alteration, the individuals must obtain approval from the Department of Pollution Control and Ecology in order to continue the mining. The question of whether approval can be obtained under one of the provided exceptions is also a question of fact. In order to obtain approval under the exception discussed above, for example, the individuals must present evidence to establish that the mining is being conducted in connection with local economic or social development, and that the designated use of Crooked Creek as an "extraordinary resource water" (as that phrase is defined) will be maintained despite the mining. The evidence that Crooked Creek's use as an "extraordinary resource water" will be maintained must specifically establish that the factor which formed the basis for the status will not be affected. See Arkansas Dept. of Pollution Control and Ecology Regulations, Regulation No. 2, Section 4(B). This means, for example, that if Crooked Creek was designated as an "extraordinary resource water" because of its "scenic beauty" (see definition of "extrardinary resource water," above), the mining cannot alter that "scenic beauty." Similarly, if Crooked Creek was designated as an "extraordinary resource water" because of its "scientific values," the mining cannot affect Crooked Creek's "scientific values." In short, the mining cannot affect the characteristic of Crooked Creek which provided the basis for its designation as an "extraordinary resource water."
Because of the fact-intensive nature of the issue that you have raised, I am unable to draw any definitive conclusions as to whether any private individuals who are mining gravel from Crooked Creek would be impacted by its designation as an "extraordinary resource water." The foregoing discussion, however, sets forth the factors that should be considered in evaluating the question.
Question 3 — If the cessation of private gravel mining on Crooked Creekwere to occur, would private citizens have any right of action againstthe State?
It is my opinion that if the cessation of private gravel mining on Crooked Creek were to occur as a result of a determination that Crooked Creek is navigable, the affected private riparian property owners would not have any right of action against the State. If, on the other hand, Crooked Creek were determined to be non-navigable, but the cessation of mining occurred as a result of the conferral of "extraordinary resource water" status upon Crooked Creek, it is my opinion that the affected private riparian property owners could, depending upon what they could factually establish, have a right of action for compensation.
Cessation of Mining Because of Navigability
If Crooked Creek is legally "navigable," the bed of Crooked Creek is owned by the State. Tennessee Gas Transmission Co. v. State,232 Ark. 156, 335 S.W.2d 312 (1960). In that case, it is not — and never has been — owned by private citizens. The occurrence of a legal determination that a body of water is navigable does not amount to a change in the character or ownership of the body of water from private to public. The legal determination in and of itself, therefore, does not amount to a taking of private property for which compensation must be made. See Ryalls v. Pigott, 580 So.2d 1140
(Miss. 1991), cert. denied, 502 U.S. 940 (1991).
My conclusion that private riparian owners do not have an ownership interest that is affected by a legal determination of navigability is reflected by the decision in Lutesville Sand Gravel Co. v.McLaughlin, 181 Ark. 574, 26 S.W.2d 892 (1930). In that case, the plaintiff, who was a riparian property owner on the Spring River, sued a gravel company to recover the value of gravel taken from the river. The plaintiff alleged that she owned the bed of the river to the center of the stream. The navigability of the Spring River had never been determined, and was therefore necessary to a decision in the case. The court determined that the river was navigable, and that therefore its bed was (and had been at the time the gravel was mined) owned by the State. Accordingly, the court held, the plaintiff had no right to recover the value of the gravel that had been mined from the river, having had no ownership interest in it.
Similarly, if the mining of gravel from Crooked Creek were to cease because of a determination that Crooked Creek is navigable, the affected private riparian property owners, having no ownership interest in the bed of Crooked Creek, would not have a right of action against the State to compensate for the cessation.
Cessation of Mining Because of ERW Status
If, on the other hand, the mining of gravel from Crooked Creek were to cease as a result of Crooked Creek being designated as an "extraordinary resource water," and if Crooked Creek is not navigable, it is my opinion that the designation could constitute a "taking" for which compensation could be required. Therefore, the affected private riparian property owners may, under those circumstances, have a right of action for compensation. However, a final determination of whether those individuals would, in fact, have a right of action would require a consideration of all of the attendant facts.
My conclusions regarding this effect of the conferral of "extraordinary resource water" status is based upon the fact that this status (as well as all of the other water quality standards that are set forth in Regulation 2 of the Department of Pollution Control and Ecology's Regulations) can be conferred upon non-navigable, privately-owned bodies of water. See Arkansas Dept. of Pollution Control and Ecology Regulations, Regulation No. 2, Section 5(A). Neither the Department's Regulations nor state law establishes navigability or state ownership as a prerequisite to the conferral of "extraordinary resource water" status or the applicability of the water quality standards. For this reason, I must conclude that such status can be conferred upon non-navigable, privately-owned bodies of water.
If, in fact, Crooked Creek is not navigable, its bed and the gravel in that bed are owned by the riparian property owners. If, in turn, Crooked Creek were designated as an extraordinary resource water (despite its non-navigability), those riparian property owners' interests in the river bed and in the gravel in that bed would be directly impacted by the designation. Depending upon what the property owners could show through specific physical and economic evidence, it is possible that they could establish a claim for compensation as a result of the designation. Again, however, this conclusion would apply only if Crooked Creek were determined to be non-navigable, and only if the riparian property owners could factually establish their claim.
The foregoing opinion, which I hereby approve, was prepared by Assistant Attorney General Suzanne Antley.
Sincerely,
WINSTON BRYANT Attorney General
WB:SBA/cyh